VIRGINIA LOUISE KENNEDY *v.* STATE OF ARKANSAS

CR 73-88                                499 S.W. 2d 842

Opinion delivered October 1, 1973
[Rehearing denied October 29, 1973.]

*Fred M. Pickens Jr., James A. McLarty & Pickens, Boyce, McLarty & Watson,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *James W. Atkins,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. Virginia Louise Kennedy was charged with first degree murder in the killing of George Henry Duty. She was convicted at a jury trial for voluntary manslaughter and sentenced to six years in the penitentiary. She contends on appeal that the trial court erred in admitting into evidence a statement she made during interrogation by police officers because she was physically and mentally unable to comprehend her constitutional rights as given to her by Lieutenant Wilson prior to making the statement.

There is no question that the appellant fired the fatal shot that killed George Henry Duty. She was well-known to the law enforcement officers having been previously convicted for grand larceny, prostitution, forgery and uttering, assault with intent to kill, and having been arrested on numerous occasions for public drunkenness.

The facts in the case at bar briefly are these: The deceased was an old boyfriend of the appellant and after he was sentenced to the penitentiary, the appellant started living with Donald Crawford in a housetrailer, or converted bus, near her mother's home. Paul Burns had been living with the appellant's mother. The deceased had recently been released from the penitentiary and he and Paul Burns and the appellant went to the housetrailer where the appellant and Crawford had been living, Crawford was already at the trailer. It appears that all the parties were drinking beer and the appellant shot and killed Duty with a .22 rifle. The appellant, Crawford, and Burns then took Duty to a hospital but he was dead upon arrival. The appellant was taken into custody at the hospital by a municipal policeman, Gary

Wilson, who transported her to the county jail where she made the statement here in question about three and a half hours after she was taken into custody. The statement was taken on a tape recorder in question and answer form and was reduced verbatim to a typed transcription. The state offered the statement in evidence at the trial and the appellant objected to its introduction, contending that it was not admissible under *Miranda.* The appellant's contention seems to be that she was intoxicated and was too drunk to understand her constitutional rights if they were explained to her, and too drunk to intelligently waive her right to the services of an attorney when she was first arrested by Officer Wilson and subsequently questioned by Officer Young. The court announced that they would have a *"Miranda* hearing" and proceeded to a hearing in chambers.

At the in-chambers hearing Officer Wilson testified that at the time he took the appellant into custody at the hospital, he told her she had a right to remain silent and anything she said could be used against her in a court of law; that she had the right to an attorney and have him present while she was being questioned and if she could not afford to hire an attorney, one would be appointed for her. He said that he asked her if she understood the warning and she said that she did. He said the arrest was made and warning given at approximately 7:00 p.m.; that the case being a "county case" Sheriff Henderson was handling the investigation and he simply transported the appellant to the county jail where she was questioned about 10:50 p.m. when Sheriff Henderson returned from the scene of the homicide. He said he was present when the appellant was questioned by state police Officer Young and that Officer Young again advised her of her constitutional rights. He said the warning given her was recorded along with her statement and was included in the written transcript.

At the in-chambers hearing Officer Wilson testified that the appellant "was kindly shook up" at the time of her arrest. He said she had a strong odor of intoxicants on her breath but that she was not swaying, unsteady or staggering. He said that she was crying,

but appeared to be in complete control of her faculties. He said that immediately after he arrested the appellant, he gave her an intoximeter test which registered .22. Officer Wilson then testified that he had known the appellant for three or four years; that he had arrested her on previous occasions for public drunkenness, and had observed her when she was sober. He said that in his opinion the appellant was not drunk when he arrested her at the hospital. He said she responded immediately to all questions asked her at the time of her arrest; that he had had numerous dealings with the appellant in the past years and that there was no doubt in his mind that she comprehended the questions he asked and statements he made to her in giving the *Miranda* warning.

At the in-chambers hearing Officer Young testified that when he questioned the appellant she seemed to understand every question asked her and everything said to her; that she answered all questions in a manner which would indicate she knew what she was talking about. He said the appellant had obviously been drinking but that she was not drunk. He said she would have been considered as driving while intoxicated had she been driving an automobile, but that she was coherent and able to walk and talk in a satisfactory manner.

Sheriff Henderson had testified in open court prior to the in-chambers hearing and his testimony was considered by the trial judge on the voluntariness of the statement made by the appellant. Sheriff Henderson said that he first went to the Newport Hospital when advised of the homicide. He said he talked to some of the witnesses including the appellant and then went out in the county where the homicide occurred. He said he later talked to the appellant at the county jail. He said that when he first talked to the appellant at the hospital, she was crying; that she had been drinking some but was not in a drunken condition. He said "she knew what she was doing." Sheriff Henderson testified that he had been sheriff of the county for 10 years and had seen the appellant drunk several times during that period. He said he believed he had only had her in the

county jail once or twice for public drunkenness, but he had seen her in the city jail on several occasions. He said he had observed the appellant when she was very "staggery" and had no control of her faculties. In comparing the previous occasions when he had observed her while drunk, he said that when he talked with her at the hospital "She knew everything, knew me, talked with me; she wasn't staggering." He said that the appellant had known him for some time and, prior to the interrogation, she kept asking him to help her; that she didn't mean to shoot Duty; that Duty begged her to shoot him but that she did not mean to do so. He said she indicated to him that the shooting was an accident and that during these statements he advised her to be quiet until she was advised of her rights, etc.

On cross-examination Sheriff Henderson testified that when he first went to the hospital, he talked to several witnesses and that the appellant probably did come to him and start telling her story of what had happened. He said he had seen "Cookie" (the appellant) drunk on many occasions. He then testified as follows:

"Q. Was she drunk this time?

A. No; no, she wasn't what I would say a bad drunk; she had been drinking but she was not to the point of what I would call a drunken condition.

* * *

Q. It is your opinion then and you are saying then she was in an intoxicated condition that night when you saw her?

A. She was intoxicated, yes, sir, but she was far from being drunk."

Gerald Carlyle, the deputy prosecuting attorney, testified at the in-chambers hearing. He testified that he was present when the appellant was questioned around 10:45 or 10:50 p.m.; that she appeared to be stable and

did not appear to be under the influence of intoxicants. He said that she was responsive to all questions asked her and appeared to have complete control of her senses. He said that he is of the opinion that she was thoroughly able to comprehend the *Miranda* warning given her at the time she was questioned, and that she understood the warning. He said he knew nothing of the appellant's condition at the hospital when she was first arrested and warned of her rights by Officer Wilson. He said that during the interrogation the appellant started crying at one point and the sheriff let her call her mother before she was questioned. He said that the appellant did call her mother and talk with her; that she told her mother she was in custody at the police department and was all right. He said she then settled down and gave her statement. He said that he was not present when Officer Wilson advised the appellant of her constitutional rights, but that he was present when Officer Young so advised her just prior to her statement. He said that he asked the appellant if she had been warned of her rights and she told him that she had.

The appellant testified at the in-chambers hearing. She said that she was acquainted with Officer Wilson and remembers him placing her under arrest at the hospital. She said that she knew what was meant by a warning of constitutional rights, but that she did not remember Officer Wilson warning her of her rights at the hospital. She was asked what she recalled as to her emotional state and her condition when she was arrested at the hospital and she responded, "I was just real nervous." She said she does not know whether she was crying or not but that she thinks that she was. She said she does not remember Officer Wilson telling her that she could have an attorney appointed for her if she couldn't afford one. She said that she would have asked for an attorney at that time had she known one would have been appointed for her.

> "Q. Your statement is that Mr. Gary Wilson did not tell you that?
>
> A. He may have but if he did I forgot about it."

On cross-examination the appellant testified:

"Q. Didn't you know you had the right to have an attorney if you wanted one?

A. Yes, sir, but I didn't have no way of getting hold of one."

The appellant then testified that she was convicted in the Jackson County Circuit Court in 1964 for assault with intent to kill and was sentenced to two years in the state penitentiary with the sentence suspended; that in 1965 she was sent to the state penitentiary for violating the terms of the previous suspension; that in 1968 she was convicted of grand larceny and sentenced to ten years in the penitentiary to be suspended on good behavior, and that in 1968 she was convicted for prostitution. She said that in 1972, less than three months before Duty was killed, she was again convicted of forgery and uttering and sentenced to the penitentiary for three years which was suspended. She said she pleaded guilty to all of these charges. At the conclusion of the in-chambers hearing the trial court held the statement admissible.

In the statement offered in evidence the appellant gave her name and gave her age as 28 years. The statement as recorded then reads in part as follows:

"BUDDY YOUNG: You are presently under investigation on a murder charge. You know you have the right to remain silent.

VIRGINIA KENNEDY: Yes sir.

BUDDY YOUNG: And anything you say can be used against you in a court of law.

VIRGINIA KENNEDY: Yes sir.

BUDDY YOUNG: You have the right to consult with an attorney before you make any statement.

VIRGINIA KENNEDY: Yes sir.

BUDDY YOUNG: You have the right to stop answering questions at any time for the purpose of consulting an attorney.

VIRGINIA KENNEDY: Yes sir.

BUDDY YOUNG: Now, do you want to go ahead and make a statement at this time, without an attorney present, you can waive your right to remain silent and make a statement. Do you wish to make a statement at this time?

VIRGINIA KENNEDY: Yes sir, I will."

The appellant then proceeded to give direct and responsive answers to the questions asked her. She said that Duty took her and Paul Burns to her housetrailer in his automobile and while there, Duty's brother-in-law came out to repossess the automobile from Duty. She said that Duty had been drinking some beer and argued with his brother-in-law about the automobile. She said that when Duty came back into the trailer after talking with his brother-in-law about the automobile, he started cursing and blackguarding and told Donald Crawford who was there, that if he, Duty, could not have her, the appellant, that Crawford was not about to get her. She then said:

"Then he hit me and knocked me down, whenever he did. I don't know, I just grabbed the gun and shot him."

The appellant said that Duty threatened her with a chain he jerked from the door latch and also threatened her with a knife and she just shot him and couldn't help it. She said she already had a shell in the gun because Duty had threatened her previously at her mother's home. She said she kept a shell in her gun all the time when Crawford was away from the trailer and she was there by herself. She said she was afraid of the decedent Duty. In her statement the appellant said that Duty didn't actually strike her but that he pushed her with both hands and when he did, he knocked

her down and she received a knot on her head and a bruise on her arm. She said she fell backwards and fell close to the gun so she picked it up and shot him.

Sergeant Young testified before the jury that alcohol in the body affects different people in different ways. He said that some people can be drunk and pass out with .08 or .09% and others who have developed a high tolerance can go as high as .31 or .32% and still be able to walk and talk.

Donald Crawford and Paul Burns testified as witnesses for the appellant. They both testified to the effect that some beer was being consumed by all of them on a friendly basis in the trailer. There was some testimony that a half pint of whisky was brought to the trailer by one of the parties. Their testimony was to the effect that the difficulty between Duty and the appellant arose when the automobile Duty was driving was repossessed by a former owner. They said the appellant attempted to restrain Duty from following the former owner toward the automobile after it was repossessed; that the appellant and Duty started cursing and shoving each other; that Duty threatened the appellant with a door chain and a knife and that the appellant shot him.

The appellant testified before the jury in her own defense. She said she had been drinking heavily on the day of the homicide and does not remember even going to the trailer with Duty and Paul Burns on that day. She said she had tried to think back and remember what happened but that she had been unable to do so. She said she drinks beer every day and also drinks whisky. She said she had been drinking like that ever since she was 17 years of age; that she thinks she is an alcoholic; that she had attempted to stop drinking but has been unable to do so.

We are of the opinion that the court did not err in admitting the appellant's statement into evidence. Certainly her answers to questions asked her were direct and responsive and there is nothing in the answers that

would indicate she was under any mental or physical disability at the time they were made. There is some conflicting testimony as to the amount of alcoholic beverages the appellant had consumed and the effect it had upon her, but there is substantial evidence to support the trial court's finding that the appellant was advised of her constitutional rights as set out in *Miranda* and that she knowingly and intelligently waived her right to the services of an attorney at the time she gave her statement and that she intelligently and knowingly did so.

In *Reed* v. *State*, 255 Ark. 63, 498 S.W. 2d 887, we reversed the conviction for error in admitting a statement of the accused into evidence without warning and advice of his constitutional right to the services of an attorney at the time of arrest as set out in *Miranda* v. *Arizona*, 384 U.S. 436 (1966). A similar deficiency appears in the warning given by Officer Young in the case at bar. He did not advise the appellant that an attorney would be appointed for her if she was unable to employ one. The record is not clear whether Officer Young was attempting to warn the appellant of her constitutional rights before questioning her, or whether he was attempting to determine if she had already been warned of her constitutional rights. In any event, according to Officer Wilson, he gave the appellant the complete *Miranda* warning approximately three and one-half hours before Officer Young talked to her and before she made her statement. The appellant testified that if such warning was given to her by Officer Wilson, she had forgotten about it.

In *Brooke* v. *State*, 86 Ark. 364, 111 S.W. 471, a public drunkenness ordinance was under attack. The defendant had been charged with violation of the ordinance and in that case we cited with approval the standard dictionary definition of drunk as being:

"'Under the influence of intoxicating liquor to such an extent as to have lost the normal control of one's bodily and mental faculties, and commonly, to evince a disposition to violence, quarrelsomeness and bestiality.'"

In *Miller* v. *State*, 251 Ark. 502, 474 S.W.2d 112, the appellant signed a waiver of his constitutional rights but testified at an in-chambers hearing that he had been drinking and did not remember whether his constitutional rights had been explained to him or not. His testimony was to the effect that he was too drunk to read and too drunk to know what was going on at the time he signed the waiver and statement. In that case we held that the trial court did not err in admitting the statement into evidence as voluntarily made and in doing so we pointed out that the appellant had no difficulty remembering other events in connection with his arrest and detention.

In *Hale* v. *State*, 252 Ark. 1040, 483 S.W.2d 228, we approved the action of the trial court in admitting a statement made to arresting officers 90 minutes after the accused was given the *Miranda* warning and we distinguished that case from *Scott* v. *State*, 251 Ark. 918, 475 S.W.2d 699, where there was a 90 day lapse of time between the giving of the warning and the admissions made by the accused.

In the Pennsylvania case of *Commonwealth* v. *Smith*, 447 Pa. 457, 291 S.2d 103 (1972), the conflict in the evidence was very similar to the conflict in the evidence in the case at bar and in that case the Supreme Court of Pennsylvania said:

"Appellant contends that at the time his confession was taken he was too intoxicated to understand the constitutional warnings, thereby rendering involuntary his waiver and subsequent statement. The fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded to it. See United States v. Martin, 434 F.2d 275 (5th Cir. 1970); United States v. Kershner,

432 F.2d 1066 (5th Cir. 1970); 2 Wharton's Criminal Evidence (12th Ed.) § 388 (Cum. Supp. 1970)."

The same question was presented to the Wyoming Supreme Court in *Lonquest* v. *State,* 495 P.2d 575. In admitting the confession in that case the court pointed out that no confession or statement should be received unless the maker was capable of realizing what he was saying and not suffering from delusions or hallucinations, so that he knowingly, understandingly and comprehendingly made the statement. The court pointed out, however, that the judge first and the jury are the only possible available instruments by which such determination can reasonably be made. The Wyoming Court then applied the general rule quoting from *People* v. *Schompert,* 19 N.Y.2d 300, 279 N.Y.S.2d 515, 226 N.E.2d 305, as follows:

> "'The general rule applicable to confessions obtained from persons under intoxication has been well stated to the effect that 'proof that the accused was intoxicated at the time he confessed his guilt of crime will not, without more, bar the reception of the confession in evidence. But if it is shown that the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements, then the confession is inadmissible.' ***'"

See also *People* v. *Dagge,* 295 N.E.2d 336; *State* v. *McClure,* 185 S.E. 2d 693.

The judgment is affirmed.