THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE B. HENNE, Defendant-Appellant.

(No. 72-284;

Second District—November 25, 1974.

Ralph Ruebner and Adam Lutynski, both of State Appellate Defender's Office, of Elgin, for appellant.

Albert Kennedy, State's Attorney, of Dixon, and Loren Golden, State's Attorney, of Mt. Carroll (James W. Jerz and Charles D. Sheehy, Jr., both of Illinois State's Attorney Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant, Willie B. Henne, was charged by indictment with the crimes of escape and murder. After a jury trial he was found guilty of both crimes and sentenced to not less than 3 nor more than 9 years in

the penitentiary for escape and not less than 40 nor more than 75 years in the penitentiary for murder, said sentences to be served concurrently.

The defendant appeals from his conviction and sentence for murder, assigning three grounds of error: (1) that the trial court erred in denying defendant's motion to suppress certain statements and physical evidence obtained by the police as a result of interrogations made in violation of *Miranda* requirements; (2) the defendant would not have been found guilty beyond a reasonable doubt if constitutionally impermissible evidence had been excluded at the trial; (3) the trial judge misstated the testimony of one of the witnesses (a psychiatrist) in such a manner as to prejudice the defendant in the minds of the jury.

The defendant escaped from the Carroll County jail where he was being held awaiting transportation to Joliet penitentiary as a result of a conviction for burglary. He claims he was picked up on the highway by a motorist shortly following his escape sometime between 9:30 and 10 o'clock that night. They had some drinks from a bottle of brandy which the driver of the car (the victim, Robert Cretney) purchased in a nearby tavern. Subsequently, according to the defendant, Cretney made homosexual advances to the defendant and the defendant resisted, whereupon a fight ensued. In the course of the fight the defendant killed Cretney by striking him repeatedly with an axe he found in Cretney's car.

The defendant claims he does not remember what happened after that. However, sometime around 11:30 that night a State trooper received a report of a motorist proceeding west in the eastbound lane of Route 20 west of Rockford. He turned his squad car around and gave chase, whereupon, after he flashed his signal, the motorist drew off to the side of the road and threw two objects out of the car before stopping. The State trooper, Sergeant Eisenbise, arrested the defendant, who was driving the car, and who acted intoxicated. Another squad car came by to assist and at the suggestion of Eisenbise the other trooper searched the area of the place where the car had stopped and found a wallet and a three-fourths empty bottle of Five Star brandy near the car.

The defendant was arrested and taken to the police station where he was charged with driving while intoxicated. At the station the defendant, who at that time was thought to be Cretney, was given a breath-o-lyzer test as well as some other routine tests for intoxication. Before giving the breath-o-lyzer test the State trooper Eisenbise read the *Miranda* warnings to the defendant. Trooper Eisenbise testified that the defendant appeared to be drunk at that time. He could not sit up straight, his speech was slurred and he made no audible answers in response to the *Miranda* warnings and fell off the chair he was sitting on. However,

Sergeant Eisenbise testified at the trial that the defendant nodded his head in an affirmative manner when asked if he understood that he had the following rights: The right to remain silent, the right to have an attorney present, if he could not afford an attorney one would be appointed for him before any investigation, and that anything he said could be used against him in court. The officer, in making out the Illinois alcoholic influence report indicated thereon that at the time the defendant was given the test and the *Miranda* warnings were read to him he had a strong odor of alcohol on his breath, his attitude was sleepy and indifferent and he was apparently unable to perform certain walking, balancing and turning tests. However, the breath-o-lyzer test showed a reading of only 1.7 and while this was sufficient under the Illinois Vehicle Code to charge him with driving while intoxicated, it was not, according to the testimony of Sergeant Eisenbise, an extremely high reading, since theoretically a 4.0 reading was possible and the officer had personally seen readings as high as 3.0.

In examining the wallet found at the scene of the arrest a letter was found addressed to the defendant at Carroll County jail; also, the defendant appeared to be much younger than the age indicated on the driver's license of Cretney, which facts induced Trooper Eisenbise to call the Carroll County jail. That call resulted in his being informed that the defendant had escaped from jail a few hours previously. The trooper also learned from a report that Cretney had been reported missing. He arranged for a Detective Bales of the Illinois State Police to come by in the morning to interview the defendant. When Bales arrived he was informed by Sergeant Eisenbise that the defendant had been given his *Miranda* warnings the night before. Before proceeding to talk with the defendant about the whereabouts of Cretney, Detective Bales did not give the *Miranda* warnings but he did ask the defendant if he knew his constitutional rights, to which the defendant replied that he did. Bales then explained to the defendant that Cretney had been reported missing, and that he, Bales, was trying to locate him. He told defendant that Cretney was ill (he was suffering from cancer) and required attention and if not found quickly might die. Thereupon the defendant remarked, "You won't find that dude alive." Subsequently the defendant told Bales of the meeting with Cretney, the fight and that he had struck Cretney and that when he "hit a dude he stays hit." The defendant eventually led Detective Bales and the other officer to the cornfield where about 50 feet off the road, Cretney's body was found with an axe protruding from his back.

Defendant claims he was too drunk to have understood the meaning and import of the *Miranda* warnings at the time they were given to

him and therefore could not have intelligently waived the rights protected thereby, and contends the evidence obtained as a result of the statements he made to Detective Bales should have been suppressed. The scope of defendant's objection is broad, reaching not only to the two statements, "You won't find that dude alive" and, "That's [blood] not mine, that's his. Yeah, when I hit a dude he stays hit," but also the physical evidence, including the body of the victim, photographs taken at the scene, the axe and certain other papers found at the scene of the crime. The defendant cites *People v. O'Leary* (1970), 45 Ill.2d 122, and *People v. Alexander* (1968), 96 Ill.App.2d 113, in support of his contention that the statements and also all the evidence obtained through those statements should have been suppressed. While it is true that in both of these cases not only the confessions but also physical evidence obtained through such confessions were suppressed, there is no parallel whatsoever between the cited cases and the case here before us, as those cases were based on involuntariness of the confession due to coercion.

In both *O'Leary* and *Alexander*, there was positive evidence of physical abuse inducing the confessions and this was the basis for the decision upholding suppression of the evidence in both cases. There is not even a hint of physical abuse or coercion in the present case, and indeed the whole theory of defendant negates any such claim. These cases are therefore completely inapposite to the case we consider here.

More persuasive from the defendant's standpoint is the case of *People v. Roy* (1971), 49 Ill.2d 113, where the defendant, Roy, was given his *Miranda* warnings in the squad car en route to the scene of the crime. The testimony of the police officers indicated he was too drunk to understand the warnings and the defendant never said he understood the warnings. The statement made by the defendant in that case was exculpatory but nevertheless incriminating, and our Supreme Court held that since the defendant had never indicated he understood the *Miranda* warnings and was obviously in a drunken and confused state, there was no evidence of an intelligent waiver of the constitutional rights to remain silent and to have counsel present during any statement given to the police. The statement to the police that he did not shoot the defendant but did hit him with a blackjack was, therefore, suppressed.

While the case before us is similar in some respects to *Roy*, there are important differences which we feel justify a different result. In the first place, the officers in the *Roy* case conceded that the accused acted in a manner indicating he was confused, that he continually interrupted the officer giving the warnings and that when they were being given he would keep saying "What?" or "Yeah." Moreover, the officers testi-

fied that the accused never understood the *Miranda* warnings. On appeal the State did not contend that the accused had waived his *Miranda* rights but instead maintained that the question was moot because the statement in question (that the accused did not shoot the victim but he did hit him with a blackjack), was a volunteered, spontaneous statement within the exceptions to *Miranda* requirements. The State made the same claim in the present case but, as did the Supreme Court in *Roy*, we must reject this contention. While we realize that the strictures of *Miranda* are intended as a safeguard for the unwary and the indigent and the technical use of *Miranda* is to be discouraged when invoked as a mere strategem, we cannot say the interrogation of the defendant here was not accusatory or that the remark made by the defendant, "You won't find that dude alive," was voluntary and spontaneous as judged by the examples in the case of *Miranda v. Arizona* illustrating voluntary or spontaneous statements. While Detective Bales purported to be interested only in learning the whereabouts of Cretney for humanitarian reasons, it is obvious that he suspected foul play and the whereabouts of Cretney would very likely be promptly revealed only by a statement which would incriminate the defendant. We do not, therefore, hold these statements to be outside the requirements of *Miranda* as being spontaneous statements.

In the case before us, however, there is, first of all, positive evidence indicating that the defendant's mental processes were working well enough at the time of his arrest for him not only to respond to the officer's signal to stop and pull over but to impel him to try to dispose of the incriminating evidence of the wallet and bottle of brandy. In addition there is the testimony of the two officers that when the *Miranda* rights were read to him and he was asked if he understood them, the defendant nodded his head in an affirmative manner. There can be no doubt that the officers present sincerely believed they had properly admonished the defendant, for the next morning they informed Detective Bales that the defendant had been properly admonished as to his constitutional rights the night before. Otherwise it could easily have been done again at that time. It is to be noted also that while the defendant was undoubtedly intoxicated the reading on his test was only 1.7 and in the opinion of Sergeant Eisenbise, an experienced officer who testified at the trial, this is not an extremely high reading and not sufficient to create complete befuddlement. It was testified by the officer that he had seen readings as high as 3.0. Sergeant Eisenbise testified at the trial that he thought the actions and befuddlement of the defendant, in view of the not-excessive reading on the breath-o-lyzer test, among other things, were to some extent feigned.

In any event, the defendant in the case before us did, according to the officers present, acknowledge his understanding of the *Miranda* warnings by nodding his head. While the defendant's brief raises the question of how to distinguish between a nod in affirmation and a simple nodding or bobbing of a head due to drunkenness, there is no inherent right in the defendant to insist that his nod was a mere drunken gesture rather than a communication. The prior and attendant circumstances do not indicate such an extreme state of mental incapacity due to intoxication as to require an interpretation that the nod was meaningless.

██ The trial court in his memorandum denying the motion to suppress the statements made to Detective Bales and certain physical evidence, noted that the defendant replied affirmatively to Detective Bales when asked if he knew his constitutional rights and interpreted this affirmative reply as an acknowledgement that he remembered being given the admonitions the previous night. While we do not unqualifiedly accept this interpretation, since actually all that was established was that defendant "knew" his constitutional rights and not that he had been "advised" of them, still the fact that the officers advised Detective Bales that the *Miranda* warnings had been given would strongly substantiate the trial court's opinion that there had been a sufficient admonition and acknowledgement thereof the previous midnight, some 9 hours earlier. In *People v. Burbank* (1972), 53 Ill.2d 261, our Supreme Court said the preliminary inquiry as to whether the defendant has been properly warned and whether he knowingly waived his rights is for the trial court. In making its determination the court need not be convinced beyond a reasonable doubt, and its findings will not be disturbed unless it can be said they are against the manifest weight of the evidence. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L.Ed.2d 618, 92 S.Ct. 619; *People v. Dailey* (1972), 51 Ill.2d 239; *People v. Higgins* (1972), 50 Ill.2d 221. Also see *Britt v. Commonwealth* (Ky. 1974), 512 S.W.2d 496.) We are not prepared to find in this case that the trial court's decision was against the manifest weight of the evidence.

We conclude, therefore, as did the trial court, that the defendant actually was given the *Miranda* warnings at the time of the breath-o-lyzer test and therefore prior to this interrogation by Detective Bales and that he acknowledged being so advised and was aware of the rights delineated by *Miranda* prior to his conversation with Detective Bales. The fact that the warnings had been given some 9 hours previously does not destroy their effectiveness (*People v. Hill* (1968), 39 Ill.2d 125), especially since the defendant was asked by Detective Bales prior to the conversation if he knew his constitutional rights and he answered in

the affirmative with a vulgar reference to his previous conviction, "* * * those * * * railroaded me," indicating some sophistication in this area.

Before the interview began defendant asked if he could have a cigarette, which was given to him. Then he asked if "we have to talk with those two guys here," whereupon the other two officers were asked to leave by Detective Bales and did so. It is obvious that the defendant was disposed to give the detective information and since the only information in his possession was highly incriminating, it seems farfetched to say that the defendant should have been specifically warned as to his constitutional rights all over again by Detective Bales. There can be little doubt that the defendant knew through his previous trial and conviction of his right to counsel, and it is not to be presumed that the presence of counsel would have been of any value to him under the circumstances. Obviously the position of the defendant was a hopeless one as to any possibility of concealing the crime or his connection with it. Once it was established that (1) the victim, Cretney, was missing, (2) that the defendant had at the same time escaped from jail, and (3) that the defendant had in his possession the victim's wallet containing his driver's license and other papers as well as the victim's automobile, the remark made by the defendant, "You won't find that dude alive" and the subsequent statement that blood on his arm was his, not mine, could hardly have compromised him much further, nor would his silence have for more than a few hours concealed the crime. Any defense based on the theory of self-defense in resisting an unwelcome homosexual advance was still as much available to him after the statement as before, and, considering the inevitability of discovery of the body, the effect of defendant's statement to Detective Bales was at most merely to advance a few hours or days the time of the crime's discovery. We can only conclude in the light of these considerations that the defendant, realizing the hopelessness of his position, waived his right to remain silent and to have counsel present, and we agree with the trial court's holding that he was well aware of his constitutional rights when he did so.

In view of our holding on this point, we need not consider whether the State's contention that in any event not all the physical evidence resulting from the search following the defendant's statements could have been suppressed as being fruit of an illegal interrogation. We restrict ourselves to holding that the evidence was sufficient to justify the trial court's decision not to suppress the statements and other evidence on the ground of a violation of the strictures of *Miranda v. Arizona.*

The defendant also complains of a statement made by the trial court

during cross-examination of the psychiatrist, Dr. Graybill, a defense witness. In the course of the cross-examination the following colloquy occurred:

"Q. [By State's Attorney]: [I]f in fact you learned there was no partaking, there was no drinking of alcoholic beverages up to the point of the attack with the axe, if you learned the drinking occurred after the axe was placed in the back of Mr. Cretney, would your opinion change as to the diagnosis of Mr. Henne?

MR. KILGUS [Defense Attorney]: Objection, Your Honor. There is no evidence by this witness or any witness that he actually put the axe in Mr. Cretney's back. He is examining him on a situation none of the witnesses have testified to.

THE COURT: He has testified that the defendant had told him this is what occurred that evening.

MR. KILGUS: He told him he didn't recall, that was his testimony.

MR. GOLDEN [State's Attorney]: He said he was drinking—

MR. PETTY [State's Attorney]: He said there was drinking, homosexual advances, a lot of statements were made to him.

MR. KILGUS: Your Honor, he has stated his question at the time the hatchet was placed in the man's back.

THE COURT: All right, strike the hatchet from the back, let him answer the question without that."

■■ The defendant contends that "a fair translation of the trial court's comment is 'The psychiatrist has testified that the defendant has admitted the act.'," and that comment, made in the presence of the jury, was extremely prejudicial. While it is true that error sufficient for reversal on appeal has been found where the trial court commented in an erroneous manner on a witness' testimony (see *Briggs v. People* (1905), 219 Ill. 330, and *People v. Bush* (1921), 300 Ill. 532, cited in defendant's brief), these were cases where the prejudice was manifest and substantially affected the judgment of the jury as to the guilt or innocence of the defendant. We cannot say such was the case here. But in any event the court immediately attempted to rectify his erroneous comment by asking the State's Attorney to repeat the question with the objectionable part excluded and we think this was sufficient under the circumstances. It could hardly be seriously contended that this minor episode as rectified by the judge's amending remark was of critical importance in convicting the defendant in view of the chain of evidence otherwise linking him to the crime. Certainly we do not consider it of sufficient gravity to warrant a new trial. The judge's remark, an inadvertent error, immediately corrected, does not, in view of the entire

record, deserve to be accorded that much importance. We are satisfied that it did not prevent the defendant from receiving a fair trial.

We therefore affirm the judgment of the trial court.

Judgment affirmed.

GUILD and SEIDENFELD, JJ., concur.