THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CORNELL MOON, Defendant-Appellant.

First District (5th Division)   No. 60205

Opinion filed May 14, 1976.

James R. Streicker, James Geis, and Kenneth L. Jones, all of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

After a jury trial, defendant was convicted of one count of murder and four counts of attempt armed robbery. He was sentenced to terms of imprisonment of from 30 to 60 years for the murder conviction and seven to 20 years for each attempt armed robbery conviction, all sentences to run concurrently.

Defendant raises four contentions on appeal:

(1) The court erred in finding an inculpatory statement made by him admissible in light of his intoxication at the time he gave the statement and certain acts of the police which discouraged him from seeking the advice of counsel;

(2) The State failed to prove him guilty beyond a reasonable doubt of knowingly and willingly participating in the attempt armed robbery which led to the murder;

(3) It was error to convict him of five offenses arising from a single course of conduct;

(4) The sentences which the court imposed were excessive.

As a result of a police investigation, defendant and three other men were arrested for their participation in an attempt armed robbery of a bar and an adjoining restaurant on the south side of Chicago on July 14, 1971. During the course of the attempt armed robbery a patron of the restaurant was shot to death.

Prior to trial defendant moved to suppress a signed statement which he gave on the night of his arrest. At the hearing on this motion Chicago police officers Rutherford Wilson and Robert Tyson were called by the State. They testified that shortly after the crime, acting on information supplied to them by an informant, they obtained a warrant for defendant's arrest. They visited defendant's mother at her home and requested her assistance in securing the surrender of her son. They told her that in view of the outstanding warrant, it might be dangerous for defendant to remain on the street. She agreed to assist them.

Early in the evening of July 22, 1971, they returned to defendant's mother's house. Defendant arrived shortly thereafter. They allowed him to say good-bye to a woman they believed to be his wife or girlfriend, his baby and several other women who they understood to be his sisters. Defendant's mother and a friend of the family accompanied them when they transported defendant to the police station. On the way they stopped at a hamburger stand to allow defendant's mother to purchase some food for her son. They informed defendant of his rights as they were driving to the station.

At the station they interrogated defendant for approximately one hour. Defendant responded in the affirmative when they inquired if he desired to make a statement, and consequently they called for a State's attorney. Initially, defendant refused to talk to the State's attorney. However, he almost immediately changed his mind and was advised of his rights. He gave an oral statement detailing his knowledge of the crime and, in response to questions put to him by the State's attorney, repeated the statement in the presence of a court reporter. Defendant refused to allow the court reporter to take his picture.

Officer Tyson testified that it was his belief that defendant may have had some drinks prior to coming to his mother's house on the evening of July 22. Both officers agreed, however, that neither defendant's speech nor his mannerisms indicated he was intoxicated. Defendant did not consume any liquor in their presence. They did not sit at the kitchen table and drink with defendant's family when they came to arrest him. They were at the house for approximately 15 minutes. They did not allow defendant to leave their presence. They did not tell either defendant or his mother that he would be better off without an attorney. The subject of securing an attorney for defendant was never mentioned. Defendant did not vomit at the police station.

Brent Carlson, an assistant State's attorney, testified for the State that during the early morning hours of July 23, 1971, he was called to the police station at 91st Street and Cottage Grove Avenue to take a statement from defendant. At first defendant was uncooperative, but when Carlson started to leave, defendant called him back. Carlson advised him of his rights. He thoroughly explained to defendant his right to counsel. Defendant stated that he understood his rights and gave an oral statement. He was advised of his rights a second time and in response to questioning again gave the statement. This time it was recorded by a court reporter. After the statement was typed, defendant signed it and initialed each page. Defendant's clothes appeared to be unruffled. There was nothing unusual about his eyes, his manner of speaking or the smell of his breath. During the course of the interrogation Carlson sat across a table from defendant, approximately four to six feet away. Defendant never complained of being intoxicated.

Carlson's testimony was substantially corroborated by that of the court reporter.

Defendant testified in support of his motion. In addition, he called his mother, Curtis Allen, John Washington and Sarah Burley, who were friends of his family, and Patricia Smith, who was his girlfriend. Basically it was their testimony that defendant had been drinking all evening on July 22, 1971. Washington, who was sent to look for defendant while the police waited at defendant's mother's house, found him in a bar. When defendant arrived at his mother's house, he began drinking vodka and beer with Officers Wilson and Tyson. The officers allowed defendant to go to a bedroom alone with Patricia Smith, where they had intercourse. Smith testified that defendant's performance was unaffected by the amount he had to drink. Defendant's mother and Curtis Allen accompanied defendant when the police transported him to the station. At defendant's request they stopped at a liquor store where they purchased a quantity of whiskey and beer. When they arrived at the police station, defendant and his mother continued to drink. Defendant

vomitted due to having consumed so much liquor on an empty stomach.

Defendant testified that when he first arrived at the station, police officers threatened to hit him "upside the head" with telephone books. He was again threatened when the State's attorney arrived. He was struck several times during the course of the night. Defendant testified that he could not remember being admonished as to his constitutional rights. He could not remember signing or initialing any written statements.

The witnesses called by defendant testfied that the arresting officers discouraged them from retaining an attorney to represent defendant. The officers told them that defendant could make a better deal with the State's attorney if he was not represented by counsel.

The court in denying defendant's motion specifically found that defendant had been drinking on the night he was arrested, that the police officers testified that he was not drunk, that both Officer Wilson and assistant State's attorney Carlson had "duly and properly" admonished defendant as to his rights, that defendant "was not so intoxicated as to be unconscious of the meaning of what was transpiring * * *" and that the oral admission and written inculpatory statement were freely and voluntarily given. The court further stated that "the extent of his intoxication goes not to the admissibility of his statement but is a relevant circumstance bearing only on his credibility."

Defendant and a co-defendant, John Cole,* were tried together. The evidence established that on July 14, 1971, an attempt armed robbery occurred in a tavern and connected Chinese restaurant on East 79th Street in Chicago. Patrons and employees of the bar who were present on the evening of the occurrence testified that they noticed some men enter the establishment and order drinks or food, that apparently upon the giving of a signal these individuals drew guns and announced a robbery, that they heard gunshots in the restaurant, and that almost immediately thereafter one of the robbers reentered the bar and said, "God damn it, there was a policeman in there." The evidence further indicated that Henry Dale, a United States marshal who was in the restaurant, was killed in an exchange of gunfire with the robbers.

Defendant's signed written statement was introduced into evidence by the State. In it defendant stated that on the evening of July 14, 1971, three men met him at his mother's house. The leader of the men was Hiram Brown. They asked defendant to come with them. Defendant's mother asked him not to go. Brown told her that they were going to get some money. Defendant, Brown and the two others drove to defendant's sister-in-law's house where there were guns stored in a suitcase. A second

---

* Cole, like defendant, was convicted of murder and four counts of attempt armed robbery. On appeal his murder conviction was affirmed, but the attempt armed robbery convictions were reversed. *(People v. Cole,* 26 Ill. App. 3d 913, 326 N.E.2d 68.) The court's opinion includes a lengthy discussion of the trial evidence in this case.

group of four men joined them, and the guns were distributed. Defendant took a .32-caliber gun and put it in his back pocket. They drove to a bar called "Duke's Lounge" which was connected to a Chinese restaurant. Defendant and three others entered the bar. Others of their group apparently entered the restaurant. He ordered a beer and waited. After a while defendant went outside where he was met by Brown who told him, "Let's go back in and we will do our thing." Defendant reentered the bar. The holdup was announced. A patron sitting next to defendant began to pull a gun, and defendant snatched it from him telling the man to "be cool." The shooting in the restaurant started, and defendant fled. He and his companions got into two cars. The police began to follow the car in which defendant was riding. Defendant's car pulled over, and everyone got out and ran. Defendant was kicked as they scrambled out of the car. Defendant stated that he did not intend to hurt anyone.

Defendant testified in his own behalf. His testimony did not coincide in several material aspects with the statement which he gave following his arrest. Defendant testfied that Hiram Brown "was known to carry guns and to force himself on people." Defendant tried to hide from Brown when Brown called for him on the evening of the shooting. Defendant decided to accompany Brown out of fear. Defendant testified that the first time he entered Duke's Lounge Brown waited outside. When he attempted to leave, Brown told him to go back inside. Since Brown was holding a gun, defendant returned to the bar. Defendant claimed he was outside the bar when the shooting began. Defendant testified that he "did not intend to hold up anyone or kill anyone." On cross-examination defendant denied taking a gun from a man after the robbery had been announced. When he reentered Duke's Lounge, he knew there was going to be a robbery. He did not try to escape through a back door nor did he attempt to warn anyone in the bar.

Defendant's mother testified on his behalf that when Brown and two other men arrived at her home on the night of July 14, 1971, defendant ran inside and told her to tell them that he was not home. Defendant came out only because he was afraid Brown would shoot her or one of the children.

## Opinion

Defendant contends that the court erred in failing to suppress the inculpatory statement he gave on the night of his arrest. Initially he claims that he did not make a knowing and intelligent waiver of his right to remain silent because he was intoxicated at the time of his arrest and was still in an inebriated state when questioned by police officers and assistant State's attorney Carlson. Defendant relies primarily on *People v. Roy,* 49 Ill. 2d 113, 273 N.E.2d 363, in which the supreme court held that a waiver of the right to remain silent by an intoxicated suspect may be deemed

invalid. In reaching this conclusion the court noted that defendant was handcuffed at the time he gave his statement, and that police testimony revealed that he appeared drunk and confused, that he smelled of alcohol, and that he was swaying. In addition, despite frequent police attempts to admonish him, the court found that his responses indicated he did not fully grasp the import of what he was being told. The court held that under such circumstances it was clear that the State did not sustain its burden of proving that defendant knowingly and intelligently waived his rights.

■■ We agree that in cases where the evidence plainly demonstrates that a suspect is so grossly intoxicated that he no longer has the capacity to knowingly waive his rights, suppression of any statements made while he was in such condition is warranted. However, it is well established that where the proof of such gross intoxication is less clear, the fact that the suspect has recently imbibed does not make his confession inadmissible but goes only to the weight to be accorded it. *United States v. Martin,* 434 F.2d 275 (5th Cir. 1970); *United States v. Kershner,* 432 F.2d 1066 (5th Cir. 1970); *Commonwealth v. Smith,* 447 Pa. 457, 291 A.2d 103 (1972).) For example, in *Smith* the Supreme Court of Pennsylvania was confronted with a defendant's challenge to a trial court's finding that his confession was admissible where the defendant testified that he had been so intoxicated that he had passed out in the police station, and even the police conceded that he had been drinking. Despite this clear evidence of recent imbibing, the court in affirming the defendant's conviction found that the record indicated that at the time he gave his statement the defendant was sufficiently alert and responsive as to have understood the nature of the interrogation to which he was subjected and the import of the questions asked of him. (See also *Kennedy v. State,* 255 Ark. 163, 499 S.W.2d 842 (1973); *State v. Rank,* 214 N.W.2d 136 (Iowa 1974).) An Illinois case applying pre-*Miranda (Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) rules of admissibility reached essentially the same conclusion under a similar set of facts. *People v. Green,* 105 Ill. App. 2d 345, 245 N.E.2d 506.

In the case at bar the court found that while defendant may have been intoxicated, he was properly admonished by both the police and an assistant State's attorney prior to giving his statement, and that he was in sufficient possession of his faculties to understand and waive his rights so that his statements were the product of his own "free will and intellect." The court made note of police testimony which disputed defendant's account of the amount he had to drink on the night of his arrest, and the fact that defendant signed and initialed each page of his written statement and had the presence of mind to refuse to allow the court reporter to photograph him.

A further examination of the record reveals that testimony as to defendant's asserted gross intoxication came only from his family and friends. These same witnesses testified that Officers Tyson and Wilson, when they arrived to arrest defendant for the murder of a United States marshal, drank vodka and beer with them for an hour before they removed defendant from his mother's home, allowed defendant to leave their presence to have intercourse with his girlfriend, stopped while transporting defendant to the police station so that more liquor could be purchased and allowed defendant to continue his drinking spree at Area 2 robbery headquarters. A story of this nature could reasonably be discounted by the finder of fact.

■■ There can be no doubt that the warnings given defendant complied with the requirements set out in *Miranda*. Whether he understood and waived them, notwithstanding the fact that he had been drinking, was a factual question, the answer to which depended upon the acceptance of the testimony of defendant and his witnesses or that of two police officers, an assistant State's attorney and a court reporter. The credibility and weight to be given the testimony of witnesses is a matter to be determined by the trial judge, and his determination will not be reversed unless it appears to be palpably erroneous. On the basis of the record before us we cannot say that the trial judge erred in concluding that there was no infringement of defendant's constitutional rights and that his statements should not be suppressed. See *People v. Noonan*, 5 Ill. App. 3d 1109, 284 N.E.2d 446; *People v. Walker*, 18 Ill. App. 3d 351, 309 N.E.2d 716; *People v. Henne*, 23 Ill. App. 3d 567, 319 N.E.2d 596.

Defendant also argues that his statements should have been suppressed due to the improper conduct of the arresting officers in discouraging his mother from getting him an attorney. Defendant points to the testimony of his witnesses that the officers told Mrs. Moon that they could arrange a better deal with the prosecuting authorities than could an attorney. This testimony was squarely contradicted by that of Officer Wilson who denied telling defendant's mother that he could do more for her son than a lawyer. Officer Tyson testified that he could not recall his partner making any statements to defendant's mother regarding the retention of an attorney.

Although no express finding was made by the trial judge on the matter, it is implicit in the record before us that he found the testimony of the police officers to be more credible than that of defendant's witnesses. It is well established that a finding based on the evaluation of witness' credibility will be sustained unless it can clearly be said that it was manifestly erroneous. (See *People v. Nelson*, 58 Ill. 2d 61, 317 N.E.2d 31.) We do not believe that the finding of the trial judge in this case was "manifestly erroneous" and consequently reject defendant's assertion.

■■ Indeed, it is our opinion that even if the police officers had told defendant's mother that he didn't need an attorney, defendant's statements need not have been suppressed. Defendant was advised on several occasions on the night of his arrest of his right to consult an attorney before deciding whether or not to answer any questions and his right to have counsel appointed if he could not afford to hire an attorney. Despite being so admonished, defendant chose to waive his rights and make a statement. The supreme court in *People v. Brooks*, 51 Ill. 2d 156, 164, 281 N.E.2d 326, has held:

> "An express waiver of the right to counsel is not necessary. The test is that there be a showing of a knowing intent to speak without counsel. Once the defendant has been informed of his rights and indicates that he understands those rights it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them."

(See also *People v. Johnson*, 55 Ill. 2d 62, 302 N.E.2d 20.) In the instant case, regardless of what the police told his mother, the evidence is overwhelming that defendant knowingly and intelligently waived his right to counsel and therefore his statements were admissible.

Defendant next contends that the State failed to prove beyond a reasonable doubt that he knowingly and willingly participated in the crimes for which he was tried. He points to such factors as his asserted reluctance to join Hiram Brown and his other co-defendants on the night of the crime, his failure to draw his gun during the attempt armed robbery, the fact that he was in another room over 45 feet from the area where the gunfire resulting in Henry Dale's death occurred, and his statements to the police and trial testimony to the effect that he did not intend to take any money or hurt anyone. It is the State's basic position that defendant was properly convicted due to his acquiescence in criminal activity planned by his companions coupled with his presence at the scene of the crime.

It was for the jury, of course, to determine whether defendant was responsible for the conduct of his companions on the night of July 14, 1971.

In *People v. Tate*, 63 Ill. 2d 105, 109, 346 N.E.2d 79, it was held:

> "The jury may draw inferences from the conduct of the defendant. (*People v. McClindon* (1973), 54 Ill. 2d 546.) Also, 'proof of a common purpose need not be supported by words of agreement but can be drawn from the circumstances surrounding the commission of an act by a group' (*People v. Richardson* (1965), 32 Ill. 2d 472, 476), and 'circumstances may show there is a common design to do an unlawful act to which all assent' (*People v. Washington* (1962), 26 Ill. 2d 207, 209)."

Thus while it is well established "that mere presence or negative acquiescence is not enough to constitute a person a principal (*Tate*), it is equally clear that one may aid or abet the commission of a crime and thereby be held accountable "without actively participating in an overt act." *People v. Dickens*, 19 Ill. App. 3d 419, 421, 311 N.E.2d 705.

In many ways the instant case is similar to the cases involving confrontation between street gangs or informal youth groups. There, as in the case at bar, there are acts by two or more people indicating their knowledge of a hostile and potentially dangerous situation, with one or more persons voluntarily taking up arms in anticipation of violence and the actual violence resulting in death. *Tate*.

For example, in *People v. Hughes*, 26 Ill. 2d 114, 185 N.E.2d 834, the defendant was one of a group of six teenagers, all members of a street gang who sought a rival group with whom they were having difficulty. One of the gang fired a shotgun at a man standing in an alley, fatally wounding the individual. The court stated at pages 119-20:

> "Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes criminally liable for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively participate in the overt act itself."

The court therefore held that although the evidence did not show that defendant fired the fatal shot, "it was proved beyond a reasonable doubt that [h]e subscribed to an unlawful venture which, as a natural consequence, resulted in the death" of the decedent. See also *People v. Rudecki*, 309 Ill. 125, 140 N.E. 832; *People v. Marshall*, 398 Ill. 256, 75 N.E.2d 310; *People v. Rybka*, 16 Ill. 2d 394, 158 N.E.2d 17.

■■ In the case at bar the evidence demonstrates that defendant, perhaps reluctantly, joined a group of individuals he knew to be dangerous and prone to violence. He accompanied them to his sister-in-law's home where firearms were distributed to the group. Defendant admits that he took a gun. It seems clear, defendant's protestations to the contrary notwithstanding, that by this time defendant must have understood that he had attached himself to a group bent upon illegal acts. The record further reveals that upon arriving at the bar and restaurant defendant and several of his companions stationed themselves throughout the premises. When defendant initially attempted to leave, Hiram Brown, the leader of the group and the man who shot Henry Dale, informed defendant that it was time for them "to do their thing." Still, defendant made no attempt to warn the patrons of the bar that a robbery was

imminent nor did he try to escape from his companions through a back or side door. Indeed, in the statement given by defendant on the night of his arrest, he admitted "snatching" a gun away from a patron of the bar after the robbery had been announced. In addition, after the shooting disrupted the group's robbery plans, defendant made his escape with Brown, the leader, and one other individual. In short, the evidence demonstrates that defendant, although not a participant in the shooting spree which claimed the life of a patron of the restaurant, did in fact attach himself to a group bent on illegal acts which were clearly dangerous and potentially homicidal in character, and therefore we will not upset the determination of the jury that he should be held responsible for the wrongdoing of his companions.

Defendant also argues that the State failed to rebut his affirmative defense of compulsion.

Section 7—11(a) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 7—11(a)) provides:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

This statute has been interpreted to mean "that defendant must believe violence will be inflicted upon him if he does not perform the particular conduct which constitutes the crime, and the danger must be imminent." (*People v. Davis*, 16 Ill. App. 3d 846, 848, 306 N.E.2d 897; *People v. Terry*, 30 Ill. App. 3d 713, 332 N.E.2d 765.) Thus, in *People v. Lighting*, 83 Ill. App. 2d 430, 228 N.E.2d 104, where the defendant attempted to raise the defense of compulsion, the court held that the evidence did not establish the defense since the defendant had left the presence of the one making the threats some length of time prior to the crime, and the defendant had an opportunity to withdraw from the robbery which resulted in the victim's death.

■■ I the instant case defendant directs our attention specifically to his testimony that when he first left Duke's Lounge, he was met by the gun-wielding Hiram Brown, a man with a reputation for "forcing himself on people." Defendant testified that Brown directed him to return to the bar, saying, "Let's go back in and we will do our thing." We fail to see how this occurrence successfully established the defense of compulsion. It does not appear that Brown at any time made an overt threat to harm defendant. Indeed, Brown's remarks could as easily be taken as the attempt of the leader of a robbery gang to bolster the morale of a faltering comrade. Moreover, we note that although defendant, when

he reentered the bar, was out of Brown's presence, he failed to avail himself of this opportunity to withdraw from the robbery. Rather, his statement to the police indicates that he remained in the bar until the robbery was announced and the gun battle had commenced. As the State has pointed out, the jury was instructed as to the affirmative defense of compulsion. It rejected this defense, and we see no reason to upset its determination.

■■ Defendant next complains that his conviction for murder and four counts of attempt armed robbery were improper since they were offenses arising from the same conduct. The State concedes that the "fatal shooting of Henry Dale was committed in the course of and in furtherance of the attempted armed robbery of the tavern and restaurant." We are referred to the opinion in *People v. Cole*, 26 Ill. App. 3d 913, 326 N.E.2d 68, wherein a co-defendant at the trial of this case was, like defendant, convicted on an accountability theory of murder and four counts of attempt armed robbery. The court, applying the rationale of *People v. Lilly*, 56 Ill. 2d 493, 309 N.E.2d 1, reversed Cole's convictions for attempt armed robbery. We therefore reverse defendant's convictions for attempt armed robbery and vacate the sentences entered thereon.

Finally, defendant contends that his sentence of from 30 to 60 years for murder was excessive and asks us to employ the powers conferred upon us by Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4)) to reduce his punishment.

■■ The evidence was sufficient to justify the jury's finding that defendant should be held accountable for his companions' actions which resulted in the murder of Henry Dale. As defendant himself acknowledges, "No statement can legitimately be presented to justify the conduct resulting in Mr. Dale's death." However, we believe it equally clear that defendant did not actively participate in the attempt armed robbery. Furthermore, the record developed at the hearing in aggravation and mitigation reveals defendant's strong ties to his family and his relatively unsubstantial criminal record. It is unfortunate that he did not go to greater lengths to disassociate himself from the conduct of his companions on the night of the attempt armed robbery. Having taken these factors into consideration, it is our opinion that defendant's sentence for murder should be reduced to 15 to 30 years. See *People v. Goss*, 10 Ill. App. 3d 543, 294 N.E.2d 744.

The State has argued that the identical sentence of from 30 to 60 years imposed upon co-defendant Cole was upheld. The court noted, however, that it was Cole who announced the holdup and pulled his gun to signal the initiation of the crime. Thus we believe the record makes clear that Cole was a much more active participant in the crime than defendant.

Accordingly we affirm defendant's conviction for murder but reduce

his sentence to 15 to 30 years and reverse his convictions for attempt armed robbery, vacating the sentences entered thereon.

Affirmed and modified in part; reversed and vacated in part.

LORENZ, P. J., and SULLIVAN, J., concur.