THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSE PADILLA, Defendant-Appellant.
First District (4th Division)    No. 77-1099

■■■■■■■■

Opinion filed March 22, 1979.

408

Jerome Rotenberg, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and John J. Cronin, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Jose Padilla, was convicted in a trial without a jury of the murder of Donald Bogseth. He was sentenced to 30 to 60 years imprisonment. On appeal, he contends that the court erred in denying his motion to suppress inculpatory statements he made, asserting that the statements resulted from an illegal arrest and were made by him without a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. He also argues that the evidence did not prove his guilt beyond a reasonable doubt and that the sentence he received was excessive.

The first issue raised pertains to the legality of the defendant's arrest. He states that the police took him into custody without probable cause, and that all evidence resulting from this arrest, including his statements about the incident, should have been suppressed.

On August 22, 1971, about 2:30 am., a sniper shot and killed Bogseth as he walked down North Avenue in Chicago, Illinois. At a hearing on the defendant's motion to suppress evidence relating to his arrest, a police officer testified that one week after the shooting 16-year-old Fela Lastra told him that the defendant boasted to her of shooting a man on North Avenue. She told the officer that she had been with the defendant near the scene of the murder several hours before the shooting and that the defendant showed her a rifle and fired it. Lastra gave the police the

defendant's home address. She related this information while at a police station in the company of her boyfriend, William "King Kong" Gonzalez. Gonzalez, a leader of a street gang called the Latin Kings, had been arrested for traffic violations; he had been charged at one time with an unrelated murder. Lastra had never given information to the police before that day; at trial, she denied telling the police anything about Bogseth's death.

The police took the defendant into custody and, after advising him of his constitutional rights, questioned him at a nearby police station about the murder. The defendant's mother was with him at the station. He denied any knowledge of the incident and was released, after agreeing to take a polygraph test the next day. The defendant testified that he was at the station over nine hours. The police contend that he was there only a few hours.

The next day the police again took the defendant into custody. He was given the polygraph test and requestioned about the shooting; his mother was also present. This time he made both a written and oral statement about it.

■■ An arrest without a warrant must be based on "probable cause": a reasonable belief that the person being arrested has committed an offense. (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) The defendant argues that Lastra's statements are the only basis upon which the police could believe at the time of his arrest he committed an offense and that Lastra's story is insufficient to create such a belief. He contends that she is a person of unproven reliability, that nothing was done to verify the information she gave and that the police were not in the possession of any other information which would have corroborated what she told them.

■■ The reasonableness of a belief, for probable cause purposes, is measured by the facts of the situation and the practical circumstances of everyday life. (*People v. Johnson* (1973), 15 Ill. App. 3d 741, 305 N.E.2d 208.) The police are not required to be legal technicians: the information upon which an arrest is made may be hearsay (*People v. Colbert* (1973), 10 Ill. App. 3d 758, 295 N.E.2d 225) and its quantum may be less than is necessary to secure a conviction. (*People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1072.) Its trustworthiness is assessed by the character of the informant. In the case of a professional informant, there must be a showing of prior reliability or independent corroboration of his information. (*People v. Wilson* (1970), 45 Ill. 2d 581, 262 N.E.2d 441.) But such proof is unnecessary when the information is supplied by an ordinary citizen. (*Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *In re Williams* (1975), 30 Ill. App. 3d 1025, 333 N.E.2d 674.) A finding by a trial court that probable cause to arrest existed will

not be disturbed unless it is manifestly erroneous. *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.

■■ In this case the only information which caused the police to arrest the defendant was the story Fela Lastra told them and her information was enough to create a reasonable belief that the defendant had participated in the murder of Bogseth. The hearsay nature of the information is irrelevant. Considering the information the police already possessed about the murder, Lastra's story could not be ignored. She was an acquaintance of the defendant who furnished information of his admission of participation in the murder the police were investigating and who placed him, with a rifle, in the area where the murder occurred. There is nothing in the record which would change Lastra's status from an ordinary citizen to a police informer necessitating the more stringent evaluation of her story through pre-established reliability or independent corroboration. Her relationship to Gonzalez alone is insufficient to impeach her credibility.

The defendant next contends that the statements he gave the police about the killing were made in contravention of his privilege against self-incrimination and his right to counsel because his deficient mental capacity prevented a knowing and intelligent waiver of these rights.

At the time of his arrest and interrogation, the defendant was 17 years old. At the hearing on the motion to suppress, there was evidence that he had completed only third grade and that he could neither read nor write English; he said that his knowledge of Spanish was minimal. In 1964, a test registered his IQ at 78; in 1965 his IQ was registered at 72. School officials testified that while under their care the defendant was placed in classes for the educably mentally handicapped. The IQ of people who are deemed educably mentally handicapped ranges from 50 to 80. However, testimony also indicated that poor school performance did not always denote low intelligence. One teacher stated that the same person who fails in school may be intelligent in other areas, such as the ways of the street.

When first taken into custody by the police on August 29, 1975, the defendant was told of his constitutional rights through the *Miranda* warnings, including that he possessed a privilege against self-incrimination and a right to counsel. It is unclear whether the defendant was again admonished about these rights on the next day when he gave the police a written statement concerning the incident. At the motion to suppress, the defendant and a police officer testified that he was so warned; however, another officer testified the defendant was not reacquainted with his rights. But this same officer at trial said that the *Miranda* warnings were read to the defendant before he made the written statement. While the written statement was taken, the defendant's mother was present and an interpreter apprised her, in Spanish, of it. The

statement was read back to the defendant in English. He said he understood it and he signed it.

The defendant made an oral statement to an Assistant State's Attorney about the incident subsequent to the written one. Immediately before making the oral statement, the defendant was cautioned about his constitutional rights. Afterwards, the Assistant State's Attorney asked him if a court reporter could transcribe the statement, saying "no one will ever know about it but yourself, myself and the court reporter." The defendant asked, "will this all be used against me?" He was told that it could and would probably be used against him in a court of law. The defendant said, "I don't want to say no more"; the interrogation ended.

■ The State has the burden of proving that a defendant's statements are voluntarily made with knowledge of his constitutional protections. (Ill. Rev. Stat. 1975, ch. 38, par. 114—11.) A trial court need not be convinced beyond a reasonable doubt that a statement was voluntary and a reviewing court will not disturb a finding of voluntariness unless, considering the totality of the circumstances, the finding is contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.

Although seven- or eight-year-old school records indicate that the defendant may not be of average intelligence, subnormal mentality alone does not render a statement involuntary. (*People v. Gonzales* (1974), 22 Ill. App. 3d 83, 316 N.E.2d 800.) In several cases, defendants with mental capacities similar to the defendant's have been held to be able to make knowing and intelligent waivers of their rights. (See *People v. Cooper* (1975), 30 Ill. App. 3d 326, 332 N.E.2d 453; *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457.) Here, the judge ruling on the motion to suppress had a chance to evaluate the defendant's ability to understand and respond to questions and that evaluation must be acknowledged as an important factor in the decision that the defendant's mentality did not impair his ability to understand and waive his constitutional rights.

■■ ■ Both statements were made by the defendant in non-threatening situations, after he was cautioned about his constitutional rights. His mother was present at the time he gave the police the written statement and she was made aware of what was going on; her presence is a factor which militates against an intimidating atmosphere. (See *People v. McCottrell* (1969), 117 Ill. App. 2d 1, 254 N.E.2d 284.) When the defendant was first taken into custody and questioned, he was told about his constitutional protections concerning police questioning. Although there is some evidence that the police did not repeat the *Miranda* warnings before the defendant made and signed the written statement on the next day, other evidence, including the defendant's own testimony shows that these warnings were given. But even in the event that they

were not, the failure to restate *Miranda* warnings before questioning the defendant a second time would not automatically invalidate his statements. (*People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367.) It is not necessary to repeat the warnings at the beginning of each interrogation if other evidence shows that the defendant was adequately apprised of his constitutional rights, and his waiver of them was freely made. See *People v. Hill; People v. Rosario* (1972), 4 Ill. App. 3d 642, 281 N.E.2d 714; *People v. Henne* (1974), 23 Ill. App. 3d 567, 319 N.E.2d 596.

■■ Finally, before the defendant gave an oral statement to the Assistant State's Attorney about the killing, he was advised of his rights and indicated that he understood their significance by exercising them in refusing to have the statement transcribed. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393.) The combination of these circumstances shows that the finding that the defendant made a knowing and intelligent relinquishment of his constitutional rights before he made admissions to the police was not contrary to the manifest weight of the evidence.

The defendant argues that he was not convicted beyond a reasonable doubt because there are irreconcilable conflicts in the evidence the State presented against him and because there was no independent corroboration of his confession. The defendant's out-of-court statements only admit that he assisted another person in shooting Bogseth. However, a trial witness, Paul Hernandez, testified that the defendant said he actually shot Bogseth and intended to blame the killing on another person.

This conflict in evidence, the testimony that the defendant shot Bogseth and the defendant's admissions that he helped someone else to shoot Bogseth, does not create a reasonable doubt of his guilt. First, at most, the conflict concerns an evaluation of witness credibility. The evaluation of the credibility of witnesses, the determination of the weight to give testimony and the inferences to draw from the testimony is a function of the trier of fact. On review, the decision of which evidence to believe will not be overturned merely because a conflict in evidence exists. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

■■ Second, independent corroboration existed to verify the defendant's admissions. The defendant himself led the police to the rifle used in the killing, showed them the scene of the murder, recreated the shooting and assisted the police in finding some spent gun shells from the rifle nearby. Hernandez's account of the incident, except for the conflict as to who actually pulled the trigger, also corroborates the defendant's statements. That evidence, coupled with the defendant's admissions was sufficient to prove, beyond a reasonable doubt, that the defendant shot Bogseth.

The defendant also contends that the sentence he received, 30 to 60 years imprisonment, is excessive. He alleges that the trial court was "more

concerned" with the retribution for the sniper killing than with his possible rehabilitation.

The imposition of a sentence is a matter of judicial discretion and absent an abuse of that discretion, a sentence may not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 870.) The defendant does not contend that the trial judge abused his discretion by considering improper factors or ignoring relevant ones in imposing sentence. The essence of his argument is that the trial judge gave more weight to one sentencing factor than another. In such a situation, a reviewing court cannot upset the original sentence. *Perruquet.*

We, therefore, affirm the decision of the circuit court of Cook County.

Affirmed.

LINN and ROMITI, JJ., concur.