THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BILLY B. DENBY, Defendant-Appellant.

Fifth District    No. 80-284

Opinion filed November 17, 1981.—Rehearing denied December 21, 1981.

1142

S. Russell Meyer, of Wyss, Meyer and Stillwell, of Alton, and Jona Goldschmidt, of Carbondale, for appellant.

Donald Weber, State's Attorney, of Edwardsville (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Defendant, Billy B. Denby, was charged by amended information with murder, armed violence, and involuntary manslaughter. All of the charges involved the death of Edward Pence, Jr. Following a jury trial in the circuit court of Madison County, defendant was convicted of armed violence, found not guilty of involuntary manslaughter, and a mistrial was declared as to the murder count due to the jury's inability to reach a verdict. Defendant was sentenced to a term of imprisonment of five years. The following issues are raised by defendant's appeal: (1) whether

defendant has waived all issues by failing to file a written post-trial motion; (2) whether the armed violence statute is unconstitutionally vague; (3) whether the verdicts were consistent; (4) whether defendant's motion to suppress his statements was properly denied; (5) whether defendant was proved guilty beyond a reasonable doubt; (6) whether the trial court improperly restricted defense counsel's cross-examination of a State witness; and (7) whether the trial court erred in excluding certain statements made by the decedent. We affirm.

Prior to trial, defendant filed a motion to suppress certain statements made while in the custody of the Granite City police. After a hearing, wherein the trial court heard the testimony of Detectives David Ruebhausen and Jerry Wilson, the motion was denied.

At the trial, James Lloyd, the chief of police in Roxana, Illinois, testified that on October 3, 1979, at approximately 9 a.m., the defendant with whom he was socially acquainted, entered the police station and stated that he "had to kill a man last night" at his house in Granite City. Chief Lloyd drove defendant to the Granite City police but did not discuss the killing. However, at one point in the conversation, defendant asked Chief Lloyd if he had "ever been backed up against the wall" and suggested that was what happened regarding the killing.

Kenneth Brueggeman, the defendant's brother-in-law, stated that at about 8:30 a.m. on October 3, 1979, the defendant visited his house and informed him that he thought he had killed a man the night before and mentioned something about being attacked.

Donna Landcaster, a barmaid at Ken's Lounge in Granite City, testified that Mr. Pence had been at her place of employment between 5:30 and 6:30 p.m. on October 2, 1979. During this time she observed him have one drink and stated he did not appear intoxicated. She never heard Mr. Pence mention the defendant.

Claude L. Robertson, defendant's neighbor, stated that while returning from work at about midnight, he noticed a strange car parked near defendant's house. It was established through other testimony that this car belonged to Mr. Pence's daughter and that Mr. Pence drove it occasionally.

Lieutenant Gerald Pinkerton of the Granite City police testified that on October 3, 1979, he was dispatched to the defendant's house, where he observed the deceased's body lying on the kitchen floor. He said that there was a considerable amount of blood and that it was his opinion, based upon his experiences with head injuries, that the amount of blood he saw was not less than one would expect.

Detective Ruebhausen testified as follows. On October 3, 1979, he took defendant into custody, read him his *Miranda* rights, and participated in the investigation of the defendant's house. He observed a pool of blood about five to six inches in diameter under the deceased's head, a light

splattering of blood on the floor and the wall, and shattered glass, apparently from a lamp, lying about and under the deceased's body. He saw an open bottle of whiskey and detected an odor of alcohol. He stated that a baseball bat spotted with blood was found in the bedroom. Detective Jerry Wilson corroborated some of the details of this testimony.

Dennis Aubuchon, a forensic serologist, testified that the blood on the baseball bat matched the decedent's blood type. On cross-examination he stated that no blood was found on the defendant's clothes.

Detective Jerry Wilson, recalled by the State, testified that at approximately 11 a.m. on October 3, 1979, he interviewed the defendant. Wilson stated that defendant gave him the following account of the events. He related that Mr. Pence arrived at defendant's house sometime after 6 p.m. the previous evening with a bottle of whiskey and that Mr. Pence asked defendant to play some cards but defendant declined. About 30 minutes after Mr. Pence's arrival, and for some reason which defendant could not remember, an argument occurred and Mr. Pence took a swing at the defendant. Later, Mr. Pence again tried to strike the defendant, who, at that point, went into the bedroom and got a baseball bat. Defendant told Officer Wilson he had been drinking that day and could remember nothing after that.

On October 4, 1979, while they were returning from the hospital where defendant's blood sample was taken pursuant to court order, Detective Wilson, after reminding defendant of his right to silence, asked the defendant what Mr. Pence did which caused defendant to react so violently. The defendant responded that Mr. Pence did nothing to provoke a violent reaction but that it was just something which had built up over time.

Dr. Steven Paul Nuernberger, a pathologist, testified that Mr. Pence's death was caused by a trauma to the head inflicted by a blunt instrument, possibly a baseball bat. He also was of the opinion that, based on his observation of the scene, the location where the body was found was not where the decedent was killed because the amount of blood present was inconsistent with decedent's head injuries. Dr. Nuernberger placed the time of death between 4 p.m. on October 2, 1979, and 8 a.m. the next day.

Rose Murphy, another barmaid at Ken's Lounge, testified for the defense that between 2:30 and 6 p.m. on October 2, 1979, she saw Mr. Pence at the bar. Mr. Pence appeared nervous and anxious and kept going to the phone booth. On cross-examination she stated that Mr. Pence did not appear either angry or intoxicated.

Donald D. Brueggeman, defendant's nephew, testified that on October 3, 1979, he observed 14 or 15 beer cans in a wastebasket and a bottle of gin or vodka on the counter in the defendant's house.

Defendant then called Officer Roger Hayes of the Granite City

police and recalled Officers Ruebhausen and Wilson. Officers Hayes and Ruebhausen stated that they observed no evidence that the crime scene had been cleaned.

Jerry Lee Nelson, the owner of a bar in Pontoon Beach, Illinois, testified that between 4:30 and 6:30 p.m. on October 2, 1979, he saw defendant at his establishment and that he appeared to have been drinking.

The defendant, in his testimony, gave the following version of what transpired. On October 2, 1979, he spent much of the day drinking beer. Early that evening, Mr. Pence, a long-time acquaintance, stopped by the defendant's house in Granite City with a bottle of whiskey and 7-Up. Defendant and Mr. Pence conversed and drank for a time. Then, Mr. Pence said that defendant owed him $100 from a card game which had taken place a year earlier. Defendant recalled Mr. Pence saying "if I don't get that $100 from you pretty soon, I am going to take this knife out and skin you alive." Subsequently, Mr. Pence took a swing at the defendant but missed. As the defendant walked to the bathroom, Mr. Pence started poking him in the chest and Mr. Pence and the defendant began shoving each other. The next thing he could remember was waking up in his apartment located in Wood River, Illinois. The defendant denied telling Detective Wilson that he went to the bedroom to get a baseball bat and explained that in response to one of Detective Wilson's questions he said it was a good possibility that he went for the baseball bat. Defendant completely denied subsequently telling Detective Wilson that things had been building up between him and Mr. Pence. On cross-examination defendant said he never mentioned the shoving match between himself and Mr. Pence to either Chief Lloyd, Kenneth Brueggeman, or Detective Wilson. He stated that he was not "stumbling drunk" but had consumed 18 to 24 beers and some whiskey.

Dr. Nuernberger, recalled to the stand by the defense, reiterated his opinion that the amount of blood which he observed in the area where Mr. Pence's body was found was inconsistent with the head injuries received. Dr. George E. Gantner, Jr., a professor of pathology at the St. Louis School of Medicine and chief medical examiner for the City of St. Louis, concurred with Dr. Nuernberger's analysis.

Lovie Williams, the defendant's housekeeper, described Mr. Pence as a mean and impolite man and described the defendant as quiet and courteous.

In rebuttal, the State recalled Officers Pinkerton, Ruebhausen, and Wilson. Detective Wilson testified that defendant never mentioned in his statement of October 3, 1979, that Mr. Pence had demanded $100 from him, nor did he mention any physical contact between himself and Mr. Pence.

On surrebuttal, the defendant recalled Officers Ruebhausen and Wilson. Detective Ruebhausen testified that he observed a bag of beer cans near defendant's Wood River apartment. Detective Wilson reaffirmed his earlier testimony that while it was possible that he had questioned the defendant about the baseball bat, he specifically recalled that the defendant had said that he got a baseball bat during the argument with Mr. Pence.

■■ The State contends that the defendant has waived all issues on appeal by failing to file a written post-trial motion. However, as defendant points out, an oral motion for a new trial which is not objected to by the prosecution preserves all errors of record. (*People v. Whitehead* (1966), 35 Ill. 2d 501, 221 N.E.2d 256.) Since the defendant made an oral motion for a new trial without objection by the State, we hold that all issues herein have not been waived although the trial court did insist that defendant file a written, rather than an oral, post-trial motion.

■■ While the defendant may raise any issues which may appear of record, the rule remains that the defendant must raise the issue of the constitutionality of a statute in the trial court in order to preserve it for appeal. (*People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353; *People v. Guzzardo* (1979), 69 Ill. App. 3d 252, 387 N.E.2d 896.) Here, the defendant for the first time on appeal attacks the armed violence statute (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—1 and 33A—2) as being unconstitutionally vague. There was no development of defendant's contentions regarding the constitutionality question in the trial court and no constitutional challenge to the armed violence statute was argued or ruled upon. Therefore, we hold that defendant has failed to preserve the issue regarding the constitutionality of the armed violence statute and we will not consider it.

■■ The defendant next urges that the jury improperly rendered a verdict of guilty on the armed violence offense while at the same time finding him not guilty of involuntary manslaughter and failing to reach a verdict on the murder count. Defendant first suggests that no underlying felony has been proved. This contention is apparently premised on the notion that either murder or involuntary manslaughter constituted the underlying felony upon which the armed violence charge was predicated; however, this is not correct. The amended information charging armed violence specifically stated that the underlying felony upon which the charge was based was voluntary manslaughter. It alleged that defendant knowingly caused the death of the decedent but did so under an unreasonable belief that he was in danger of receiving bodily harm. Further, the jury was properly instructed in this regard. Thus, the jury made no finding that defendant was not guilty of voluntary manslaughter although it did find

him innocent of involuntary manslaughter. Alternatively, the defendant contends that the jury's finding that he acted knowingly but not recklessly under the involuntary manslaughter statute, coupled with the jury's failure to reach a decision on the intent to kill necessary for the offense of murder, renders the verdicts logically inconsistent. However, it is well settled that logical consistency in verdicts is not required so long as the verdicts are not legally inconsistent. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) Here, the jury may well have agreed that defendant was guilty of armed violence as charged and been unable to agree upon a murder verdict. Therefore, we find no error in the jury's verdicts.

Defendant next maintains that the trial court erred in denying his motion to suppress statements made to Detective Wilson after he had invoked his right to counsel. His contention is twofold. First, he contends that his right to remain silent was violated under the standard set forth in *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321. Second, he maintains that he did not waive his right to counsel.

The testimony of the arresting and interrogating officers was the only evidence presented at the hearing on defendant's motion to suppress. Detective Ruebhausen testified that on October 3, 1979, he took defendant into custody at defendant's house in Granite City and advised him of his *Miranda* rights. Approximately an hour later, Detective Wilson questioned the defendant. Detective Wilson again advised the defendant of his *Miranda* rights prior to questioning. The defendant indicated he understood these rights and elected to speak with Officer Wilson. Subsequently, an officer knocked on the door and advised the defendant that his attorney had arrived. Detective Wilson then asked defendant if he wished to sign the statement he had given. The defendant said that he did not wish to do so without consulting his attorney, and at that point all questioning ceased. Defendant was allowed to consult with his attorney and he did so from 30 minutes to an hour. Upon leaving, defendant's attorney told Detective Wilson not to talk with his client.

The following evening, Detective Wilson took the defendant to a hospital to obtain a court ordered blood sample. While defendant was being returned to his cell, Detective Wilson asked defendant a question. He preceded the question by advising the defendant that he did not have to talk to him and reminding him that his attorney had told him he did not have to talk to the police. The defendant replied that he knew his rights. Detective Wilson then told the defendant that the police investigation indicated that he was not a violent man and he was curious what the victim said that caused him to act like he did. The defendant responded, "Nothing." When Detective Wilson said he did not understand why

defendant became so violent, the defendant replied that it was "just something that built up over a period of time." It is these statements that the defendant sought to suppress.

■■ There is no *per se* proscription of all questioning after a suspect has indicated a desire to remain silent, and the admissibility of subsequent statements depends on whether his right to cut off questioning was scrupulously honored. (*Michigan v. Mosley; People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132.) Among the factors to consider in making this determination are the time interval between the suspect's exercise of his right to remain silent and the reinterrogation and whether defendant was given a fresh set of *Miranda* warnings. *People v. Pleasant.*

In the case at bar, on October 3, 1979, when defendant was informed that his attorney had arrived and defendant indicated that he wished to stop the interrogation, Detective Wilson ceased all questioning. Defendant then conferred with counsel. About 32 hours later, after advising defendant that he need not answer any questions, Detective Wilson again spoke with the defendant. The defendant indicated that he was aware of his constitutional rights but, nevertheless, responded to a number of questions. We believe, under the circumstances here presented, that defendant's right to remain silent was scrupulously honored. Although it may be preferable procedure to read the defendant a complete set of *Miranda* warnings upon reinterrogation, it is not required. *People v. Pleasant.*

■■ ■ The Illinois Supreme Court has applied the *Mosley* rationale to cases involving the right to counsel and has held that the right to the presence of an attorney during an interrogation may be subsequently waived despite an initial request for counsel. (*People v. Aldridge* (1980), 79 Ill. 2d 87, 402 N.E.2d 176; *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56.) In order to establish a valid waiver of the right to counsel, the State must prove a knowing and intelligent relinquishment or abandonment of a known right or privilege. (*Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.) We conclude that the State has done so in this case. The evidence establishes that defendant was informed of his *Miranda* rights on two occasions, once by Officer Ruebhausen and again by Officer Wilson. Questioning immediately ended when defendant indicated he wished to consult with his attorney, which he was allowed to do. The next evening, while returning defendant to his cell, Detective Wilson told the defendant that he was not required to talk with him and reminded defendant of his attorney's advice not to speak with him. He asked defendant whether he recalled his constitutional rights and defendant replied that he did. The defendant then responded to two questions propounded by Detective Wilson. These circumstances suggest that

defendant was fully aware of his right to counsel but elected to forego that right.

This case differs from *Brewer v. Williams*, relied upon by the defendant, in two respects. The defendant in *Brewer* was never asked if he wished to remain silent, and the questioning occurred prior to the time he was able to speak with his attorney. Here, the defendant was admonished by Officer Wilson that he could remain silent, and the defendant had had an opportunity to confer with counsel before the subsequent questioning. We are not faced with a situation in which counsel had not been made available to the defendant after he had indicated his desire to have counsel, as was the case in *Edwards v. Arizona* (1981), ___ U.S. ___, 68 L. Ed. 2d 378, 101 S. Ct. 1880. In the instant case, the defendant was afforded both an opportunity to confer with counsel and an opportunity to exercise his right to silence. Under these circumstances, we conclude that defendant's statements were properly admitted into evidence.

Defendant next challenges the proof of his guilt beyond a reasonable doubt. Essentially, defendant contends that the testimony of the two pathologists that the amount of blood in the area where the deceased's body was found suggested that the crime occurred elsewhere; that no blood was found on his clothes; and that the evidence of his voluntary intoxication all mandate a reversal of his conviction. We disagree.

■■ The defendant's conviction for armed violence is supported by the following facts: (1) defendant volunteered to police officers he "had to kill a man last night"; (2) the decedent's body and a bloody baseball bat were discovered in defendant's house; and (3) defendant recalled having an argument with the decedent during the course of which he went to get a baseball bat. In short, the evidence at most is merely conflicting and in such cases this court will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Hairston.*) Moreover, we are not persuaded that defendant's claimed alcoholic amnesia warrants reversal in light of the clarity and detail of the defendant's recollection of the events prior to the argument with the deceased. *People v. Jones* (1977), 56 Ill. App. 3d 600, 371 N.E.2d 1150.

■■ Defendant next contends that the trial court improperly limited his cross-examination of a tavern employee, Donna Landcaster, by sustaining an objection to his inquiry as to whether she had ever discussed the liability of the tavern with her employer. The scope of cross-examination is left to the discretion of the trial court and reversible error occurs only where there is a clear abuse of that discretion. (*People v. Bradford* (1979), 78 Ill. App. 3d 869, 397 N.E.2d 863.) In *Bradford*, the court held it was not an abuse of discretion to preclude cross-examination of a prosecution witness concerning civil lawsuits arising out of the incident where there

was no indication that such lawsuits had been or might be filed. Similarly, in the instant case, there is no evidence that any civil action had been filed or contemplated. We find no abuse of discretion by the trial court.

Defendant's final contention is that he should have been allowed to ask a defense witness, Rose Murphy, about statements made by the decedent, Mr. Pence, on October 2, 1979, concerning the fact that he lost a large sum of money and wished to get it back. On the State's motion, the trial court excluded the decedent's statements as hearsay and as being irrelevant. On appeal, defendant maintains that the decedent's statements fall within the state of mind exception to the hearsay rule.

■■ The state of mind expressed by a victim of a crime must be relevant to the issues in the case before it may be admitted. (*People v. Perry* (1974), 22 Ill. App. 3d 738, 318 N.E.2d 17 (abstract).) In this case, no relevancy was established. The mere fact that decedent had said he lost money and desired to get it back does not logically imply, as defendant argued at trial, that the deceased went to the defendant's house for purposes of collecting a gambling debt and initiated an altercation. Without a showing that the decedent's statements were somehow connected to the defendant or the crime, the statements of the deceased were irrelevant and properly excluded.

For the reasons stated, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

HARRISON and WELCH, JJ., concur.