THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENZO WILSON, Defendant-Appellant.

Second District    No. 2—82—0712

Opinion filed November 20, 1985.

Charles Hoffman, of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Dale M. Wood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

The defendant, Lorenzo Wilson, was charged by information with four counts of murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1) and (2)), two counts of attempted murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—4(a)) and two counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—1). Following a jury trial in the circuit court of Lake County, he was found not guilty of attempted murder but guilty of murder and voluntary manslaughter. He was sentenced to consecutive terms of natural life on the murder conviction and an extended term of 14 years for the voluntary manslaughter.

Defendant now appeals and raises numerous contentions before this court: (1) that the trial court erred in not suppressing his post-arrest statements; (2) that the court below abused its discretion in denying his request for a continuance of the trial date; (3) that it was reversible error for the State to impeach defendant with a statement upon which no determination of voluntariness had been made; (4) that it was an abuse of discretion for the trial court to find, prior to imposition of the sentence, that defendant went to the scene of the crime with the intent to commit a double murder; (5) that the lower court erred in failing to consider certain mitigating factors in imposing a sentence of natural life; and (6) that it was erroneous for the trial court to impose an extended-term sentence on the voluntary manslaughter conviction.

At the hearing on defendant's motion to suppress the State introduced the following evidence. Zion Police Sergeant Lester Guthrie

testified that late on the evening of March 26, 1981, he received a dispatch to be on the lookout for the defendant, a Zion resident, who was wanted by the Waukegan police in connection with a homicide investigation. Guthrie and another police officer, Sylvester Hampton, drove to defendant's apartment and encountered him pulling into the parking lot. He was taken into custody, read his *Miranda* rights and transported to the Zion police station. No questioning occurred on the way to the station. Upon their arrival, Guthrie again read defendant his rights off a preprinted rights sheet. Defendant then signed the form indicating that he understood all of his rights.

Guthrie next asked him to read a waiver of rights form. He did so but stated that he did not wish to make any statements or answer any questions. Consequently, Guthrie wrote "refused" on the relevant portion of the form and all questioning ceased.

About 30 minutes later, Waukegan Detectives Story and Bullock arrived to take custody of defendant. Guthrie testified that up to that point the defendant had not asked to see an attorney or to make any telephone calls. Guthrie then advised Story and Bullock that defendant had been read his *Miranda* warnings. He also gave them a copy of the arrest form and the rights sheet marked "refused."

Waukegan Detective Jon Story testified that he and Detective Bullock arrived at the Zion police station at approximately 11:50 p.m. He stated that he received two copies of the preprinted rights sheet and a copy of the arrest report. He said shortly thereafter he and Bullock took custody of defendant and began the drive back to Waukegan. As they were riding, defendant asked him what he was specifically charged with. Story replied, "[O]ne count of murder and three counts of attempted murder," to which the defendant responded, "I thought they was [*sic*] all dead." Officer Bullock then asked defendant what had occurred at 332 South Avenue. In response, the defendant proceeded to give a lengthy statement incriminating himself in the offense. Once they arrived at the Waukegan police station, defendant was again shown a waiver of rights form. He looked at it for a few minutes but refused to sign anything.

Detective Bullock corroborated Story's testimony. Under cross-examination Bullock could not recall if Sergeant Guthrie told him directly that defendant had been advised of his rights, but he stated that as they were pulling out of the Zion police station, he turned to defendant and asked him if he had been advised of his rights, to which defendant responded that he had.

At the conclusion of the State's evidence, defense counsel re-

quested that its motion to suppress be granted, arguing that the State failed to meet its burden in showing that defendant's statements were made voluntarily. After considering the arguments of counsel heard on January 20, 1982, the court allowed the motion and suppressed the statements.

On April 21, 1982, the State filed a motion for reconsideration of defendant's motion to suppress. On May 28 the court reversed its ruling.

Defense counsel subsequently requested that it be allowed to present its own evidence on the issue of voluntariness, and on the afternoon of May 28, 1982, the court heard the testimony of defendant, Lorenzo Wilson. Wilson corroborated the testimony of Officer Guthrie regarding his arrest on the night of March 26, 1981. He said, however, that during the ride to Waukegan with Detectives Bullock and Story he was never advised of his rights. He then testified that while in the squad car Bullock told him, "off the record," that he should get a "key to the city for what he did," that "those two were assholes" and that he would try to help him if he could. Defendant said Bullock did not specify how he would help him, but stated, "[J]ust tell me what else went on and this won't go on the record or anything. I just want to know for my own personal [use]." The defendant then made several incriminating statements. Later, at the Waukegan police station, Bullock asked him to repeat his statements into a tape recorder, but the defendant refused to say anything more. Defendant said that Bullock then handed him a rights waiver sheet which he only glanced at and which he refused to sign. Under cross-examination, he acknowledged that when he received his *Miranda* warnings from the Zion police he understood both his right to an attorney and his right to remain silent. He also admitted that he was never threatened or physically abused by any of the police officers.

The court reaffirmed its earlier ruling that defendant's statements were voluntary and admissible. The case was then continued to June 1, 1982, for trial.

On June 1, 1982, defense counsel moved for a continuation of the trial date on grounds that she had been caught by surprise when the court reversed its ruling on the admissibility of defendant's statements only four days before trial. In denying her motion, the court reminded her that she had known since April 21 that the ruling might be reversed, that she had also known she was to be ready for trial on June 1, and that she had had considerable time to prepare her client's insanity defense, a defense which would not be sub-

stantially affected by the ruling. Accordingly, after two days of jury selection, the trial commenced on June 3, 1982.

The following evidence was adduced at trial. Two Waukegan police officers testified that on the evening of March 26, 1981, they arrived at a boarding house located at 332 South Avenue in response to a dispatch order. They discovered Arthur Lee Robinson, mortally wounded and unarmed, lying on the front porch. A short time later they found the body of Willie Earl Jones lying on the floor inside a bedroom with his hands and feet bound together with ropes. A rag was stuffed in his mouth and another rag was tied around his neck. Both victims died of bullet wounds.

Mary Armstrong testified that she arrived at the boarding house at approximately 8 p.m. and found defendant talking and shooting up drugs with Robin Hill, Bobby Tate and Willie Earl Jones. About 45 minutes later, as they were sitting in the bedroom, the defendant pulled a gun, held it on Armstrong, Hill and Jones and told Tate to get a rope and tie them up. She said that the defendant then went into the bathroom with Tate to do more drugs and a few minutes later returned and put gags in their mouths. Tate left and did not return. She stated that they were tied up for about an hour and a half while defendant waited and looked out the window. At around 9 p.m. she heard someone at the front door. She related that the defendant ran out into the hallway towards the door and a short time later she heard two or three shots. The defendant then returned to the bedroom, shot at Hill, but missed and went back out to the hallway. Armstrong then heard two or three more shots. Defendant again reappeared and shot at her but missed. She observed that he put two more bullets in his gun, walked over to Willie Earl Jones lying tied up on the bed, and shot him twice at close range. Hill and Armstrong managed to get loose and ran out of the house.

Addison Taylor testified that on the night in question, he and Arthur Lee Robinson stopped by 332 South Avenue around 9:30 p.m. According to the witness, neither of them was armed. He testified that Robinson rang the doorbell. The defendant opened the door and said, "Arthur Lee Robinson, come here motherfucker." Taylor stated that as Robinson moved away from the door, he saw the defendant point a gun at him. Taylor fell to the floor and heard two or three shots. He then looked up to see Robinson lying on the porch and the defendant standing over him with a revolver. He next saw defendant go inside the house, heard another shot, a scream and then another shot. The bullets removed from the bodies of Jones and Robinson

were later traced to the same weapon recovered from defendant's automobile.

Waukegan Detective Bullock restated his earlier testimony given at the motion to suppress hearing and testified to what the defendant stated subsequent to his arrest, when asked what occurred at 332 South Avenue. Among other statements, the defendant stated that two days earlier, Arthur Lee Robinson had sent Sanford Ford over to kill him. Apparently the defendant talked Ford out of doing it but kept Ford's gun.

The defendant at trial gave a similar account. He further stated that two days later, after he finished work he met with Robert Tate and shot "T's and blues" with him and drank beer. Later he and Tate went to 332 South Avenue "to straighten out" the situation with Arthur. Defendant had taken a gun with him because he knew Robinson carried a gun and knew Robinson had killed someone. While he was at the house, defendant, Jones, Armstrong, Tate and Hill all shot "T's and blues" and drank beer. Defendant said he began hallucinating. Tate then tied up Jones, Armstrong and Hill in order to rob them and left. Afterwards Jones began hollering at defendant that he was going to kill him because he let Tate rob him and because Ford should have taken care of him two days earlier. Defendant then put gags in their mouths so Robinson wouldn't hear them.

When Robinson arrived, he opened the door and told Robinson, "[C]ome here motherfucker, I want to talk to you." Robinson jumped back and appeared to reach for a gun. The defendant then shot him. The defendant stated that Willie Earl Jones got free and came at him like he was going to kill him, he got scared and shot Jones once and then again after he fell to the floor. He denied ever shooting at Armstrong or Hill in the bedroom. Meanwhile, he said he was hallucinating and "seeing trees." He then took off.

The jury found the defendant not guilty of the attempted murder of Robin Hill and Mary Armstrong, but guilty of the murder of Willie Lee Jones and the voluntary manslaughter of Arthur Lee Robinson.

At the sentencing hearing, a nine-page presentence report was submitted to the court. The State's only evidence in aggravation was a certified statement of conviction documenting defendant's prior conviction for robbery and attempted robbery in 1980. Defense counsel did not offer any formal evidence, but proceeded to argue numerous factors in mitigation of sentencing, including mitigating evidence adduced at trial.

The court recited at length its reasoning in imposing sentence. This included a specific finding that the defendant had a general intent and had deliberately gone to 332 South Avenue for the purpose of killing both individuals. While at the scene he fatally wounded Arthur Lee Robinson and bound, gagged and shot Willie Earl Jones, which actions showed exceptionally brutal and heinous conduct, indicative of wanton cruelty. The court further found that defendant had been convicted of robbery and attempted robbery in 1980, that his conduct caused or threatened serious harm, and that a severe sentence was necessary to deter others from committing the same offense. The court therefore imposed a term of natural life for the murder of Willie Earl Jones and an extended term of 14 years for the voluntary manslaughter of Arthur Lee Robinson. This appeal followed.

■ The defendant first contends that the trial court erred in finding defendant's post-arrest statements voluntary and admissible because his right to remain silent was not scrupulously honored. He argues that because Detective Bullock's questioning in the squad car was not preceded by a fresh set of *Miranda* warnings, and because there was no significant period between the defendant's exercise of his right to remain silent and such reinterrogation, any statements made by the defendant as a result of the questioning were involuntary and inadmissible.

The record indicates that the defendant was read his *Miranda* rights immediately after his arrest by the Zion police. He again received his rights at the Zion police station but asserted his right to remain silent. All initial questioning ceased at this point. Between 30 and 60 minutes later, custody of the defendant was transferred to the Waukegan police. Some 20 or 30 minutes after that, as the defendant was being transported to Waukegan, Detective Bullock asked the defendant if he had been advised of his rights. The defendant said that he had, and a short time later asked what he was charged with. When the police detectives told him "murder and attempted murder," he volunteered the statement, "I thought they was [*sic*] all dead." Subsequently, Detective Bullock resumed questioning, approximately an hour and a half after initial questioning had ceased, by asking "what happened at 332 South Avenue?" The defendant then gave a lengthy statement. Upon arrival at the Waukegan police station, the defendant was again readvised of his *Miranda* rights, including the right to remain silent, and refused to make a statement or sign a waiver of rights form. Accordingly, all questioning ceased.

We find these facts similar to those presented to this court in *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947, where the accused was reinterrogated by a second police officer approximately one and a quarter hours after asserting his right to remain silent during initial questioning. There, the second interrogating officer preceded his questioning by asking the defendant "if he understood [his] rights as they were presented to him earlier by [the first officer]." After indicating that he did, the defendant subsequently made an inculpatory statement regarding the alleged crime. (115 Ill. App. 3d 455, 459-60, 450 N.E.2d 947.) This court concluded that given the totality of the circumstances the defendant's right to remain silent was scrupulously honored. 115 Ill. App. 3d 455, 461, 450 N.E.2d 947.

Here, the initial questioning ceased immediately after defendant first asserted his right to remain silent. (See *People v. Young* (1983), 115 Ill. App. 3d 455, 461, 450 N.E.2d 947; *cf. People v. Thompson* (1982), 107 Ill. App. 3d 285, 437 N.E.2d 916; *People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233.) Interrogation resumed approximately 90 minutes later, a period of time "significant under *Mosley*, and sufficient to convey to defendant that his assertion of silence would be honored by the authorities." (*People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947 (1¼ hours); *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321 (one hour); *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132 (1½ hours); *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (two hours).) As in *Young*, the defendant was questioned by a different officer about the same crime during each interrogation. Although knowledge of a prior interrogation is imputed to the second interrogating officer (*People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457; *People v. Connell* (1980), 91 Ill. App. 3d 326, 332, 414 N.E.2d 796; but see *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321), neither this nor the fact that the same subject matter was addressed, necessarily renders the second interrogation unlawful. *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947; *In re D.W.S.* (1981), 99 Ill. App. 3d 1035, 1038, 426 N.E.2d 284; *People v. Connell* (1980), 91 Ill. App. 3d 326, 414 N.E.2d 796.

Finally, analogous to *Young*, it appears that the defendant was adequately readvised of his *Miranda* rights prior to reinterrogation when Detective Bullock asked him if he had previously been advised of his rights. (See *People v. Young* (1983), 115 Ill. App. 3d 455, 462, 450 N.E.2d 947.) It has been held that such an inquiry is sufficient

to give a defendant an opportunity to effectively exercise his rights (*People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947; *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 988, 411 N.E.2d 132; *People v. Denby* (1981), 102 Ill. App. 3d 1141, 1148, 430 N.E.2d 507, 512), thereby making renewed *Miranda* warnings unnecessary. See *People v. Padilla* (1979), 70 Ill. App. 3d 406, 412, 387 N.E.2d 985, *cert. denied* (1980), 445 U.S. 961, 64 L. Ed. 2d 235, 100 S. Ct. 1646; *People v. Henne* (1974), 23 Ill. App. 3d 567, 572, 319 N.E.2d 596.

■ In the instant case, the defendant admitted at a motion to suppress hearing that he was initially read his rights by the Zion police and acknowledged that he fully understood them. It is also undisputed that he never requested an attorney during the night of his arrest. It is well established that if, after a defendant has been informed of his rights, he states that he understands them and chooses to speak to an officer without requesting an attorney, sufficient evidence is presented that he knows his rights and has chosen not to exercise them. (*People v. Eatherly* (1979), 78 Ill. App. 3d 777, 781, 397 N.E.2d 533; *People v. Brooks* (1972), 51 Ill. 2d 156, 164, 281 N.E.2d 326, 332; *People v. Jenkins* (1978), 67 Ill. App. 3d 565, 568, 384 N.E.2d 1348, 1350.) Despite the defendant's testimony that Detective Bullock told him his statements in the squad car were "off the record," we give little weight to this contention in light of the fact that defendant was warned and admittedly understood that anything he said could be used against him in a court of law. Furthermore, neither *Miranda* nor any other presently existing rule of law requires that a defendant be admonished that there is no "off the record" privilege. See *People v. Prude* (1977), 66 Ill. 2d 470, 476, 363 N.E.2d 371, 373-74; *People v. Eatherly* (1979), 78 Ill. App. 3d 777, 397 N.E.2d 533; *People v. Smith* (1977), 50 Ill. App. 3d 320, 327, 365 N.E.2d 558, 563.

■ The standard of review from an order deciding a motion to suppress evidence is whether the trial court's disposition was manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 505, 304 N.E.2d 280, 282; *People v. Nash* (1979), 78 Ill. App. 3d 172, 178, 397 N.E.2d 480.) Considering the totality of circumstances in the present case, we cannot conclude that the trial court's order deeming the defendant's statements admissible was manifestly erroneous.

■ The defendant's second contention is that the court's denial of his motion for a continuance of the trial date clearly prejudiced him in the presentation of his defense. He contends that when the court reversed its ruling on May 28, 1982, the defense was given only four days, over the Memorial Day weekend, to revamp its trial

strategy in a highly complex murder case. He further contends that there were no compelling reasons for not granting the continuance, since jury selection had not begun and defendant did not assert his right to a speedy trial.

The State contends that this issue was waived by defendant's failure to include it in his post-trial motion, or, alternatively, if it was not waived, the denial of the continuance on the day of trial did not constitute prejudicial error. We agree.

By statute in Illinois the granting or denying of a motion for a continuance in a criminal case is a matter within the sound discretion of the trial court. (Ill. Rev. Stat. 1981, ch. 38, par. 114—4(c); *People v. Anderson* (1979), 77 Ill. App. 3d 907, 909, 396 N.E.2d 850.) In determining whether the trial court has abused its discretion, the specific circumstances of each case must be weighed with particular attention given to the reasons given to the trial court at the time the continuance is denied. (*People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312.) In the absence of a showing of prejudice, the denial of a motion for a continuance is not cause for reversal. *People v. Clark* (1979), 71 Ill. App. 3d 381, 405, 389 N.E.2d 911.

Here, the record reveals that the defendant failed to raise the error in his written post-trial motion. Errors not asserted as grounds for a new trial are waived and cannot be raised for the first time on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) Although there is an exception to the waiver rule, the alleged defect must be patent and plain error for the reviewing court to exercise its discretion to avoid the rule and review the error alleged. (See 87 Ill. 2d R. 615(a); *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233; *People v. Anderson* (1979), 77 Ill. App. 3d 907, 910, 396 N.E.2d 850.) Thus, errors which have not been properly preserved for review may be considered in cases where the evidence is closely balanced or the error is of such magnitude that the accused was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233.

We believe that the denial of defendant's motion for a continuance did not constitute plain error. The evidence was not closely balanced, nor was the denial so prejudicial as to embarrass the defendant in his defense. (See *People v. Coleman* (1970), 45 Ill. 2d 466, 469, 259 N.E.2d 269.) Even without defendant's post-arrest statements, there was a substantial amount of other evidence presented to the jury implicating him in the crime. Moreover, defense counsel

knew of the possibility that the ruling on the motion to suppress might be reversed as of April 21, 1982, when the State's motion to reconsider was filed. Further, defense counsel did not seek a continuance on May 28, at the time the ruling on the motion to suppress was reversed; rather, she waited until the day of trial. Additionally, as pointed out by the court at the time of the motion, a continuance would not have enabled defense counsel to prepare any more than she had on defendant's primary defense, namely a voluntary drugged condition and insanity. Finally, the record reveals that defense counsel vigorously and skillfully presented a defense in spite of the denial of her motion. Where the record shows that at trial the movant's attorney appeared thoroughly prepared and conducted his representation with diligence and skill, the courts are reluctant to find prejudice in the denial of motion for a continuance. (*People v. LaFiura* (1981), 92 Ill. App. 3d 714, 720, 415 N.E.2d 1365.) Accordingly, we find that the court did not abuse its discretion in denying defendant's motion for a continuance.

■ We next address the defendant's contention that while on trial he was prejudiced by the prosecutor's improper attempt to impeach him with an alleged statement upon which no determination of voluntariness had been made. The defendant claims additional error by the prosecutor's failure to complete the impeachment.

Prior to the hearing on the State's motion to reconsider, the State requested that it be given leave to introduce evidence on defendant's statement made while in his cell at the Waukegan police station, that "Arthur Robinson must be dead." The defendant argued that the statement had not been considered at the initial motion to suppress hearing and therefore required additional evidence. Later, when the court reversed itself and held that defendant's post-arrest statements were admissible, the State withdrew its motion and indicated that it did not intend to use the statement given in the jail cell for its case in chief but, rather, would use it only in rebuttal.

The defendant was asked on cross-examination if he remembered telling Officer Fratus at the Waukegan police station that Arthur Lee Robinson must be dead. Defense counsel objected and the court sustained the objection. In a sidebar, the prosecutor explained that he was trying to use the statement on rebuttal for impeachment purposes. The prosecutor then asked again if defendant recalled telling Officer Fratus that Arthur Lee Robinson must be dead. The defendant said he recalled no such conversation. The State did not call Officer Fratus as a witness in its rebuttal case.

It has been consistently held that the voluntary character of any out-of-court statement must first be established before the statement may be used, even for impeachment purposes. (*People v. Lefler* (1967), 38 Ill. 2d 216, 220, 230 N.E.2d 827; *People v. Hiller* (1954), 2 Ill. 2d 323, 327, 118 N.E.2d 11.) It is also well established that once the foundation for impeachment by prior inconsistent statements has been laid, it is incumbent upon counsel, having laid such foundation, to offer proof of the alleged impeachment statements. (*People v. Moore* (1973), 54 Ill. 2d 33, 294 N.E.2d 297, *cert. denied* (1973), 412 U.S. 943, 37 L. Ed. 2d 404, 93 S. Ct. 2787; *People v. Williams* (1969), 105 Ill. App. 2d 25, 34, 245 N.E.2d 17.) This is especially so if the witness denies or fails to recall making the prior statement. (*People v. Saunders* (1971), 132 Ill. App. 2d 421, 425, 270 N.E.2d 217.) However, a failure to follow through with proof of a prior inconsistent statement is not always reversible error. *People v. Tate* (1984), 122 Ill. App. 3d 660, 666, 462 N.E.2d 662; *People v. Reed* (1981), 92 Ill. App. 3d 1115, 1119, 416 N.E.2d 694; *People v. Williams* (1969), 105 Ill. App. 2d 25, 34, 245 N.E.2d 17.

■ In this case, we believe that although the prosecutor's attempt at impeachment was improper, no substantial prejudice resulted to the defendant by this error. We base this conclusion on the fact that an extensive amount of other evidence, including eyewitness testimony and the defendant's own statements at trial, clearly implicated the defendant in the crime. In addition, we find that defendant's voluntary post-arrest statement to Officer Bullock, "I thought they was [*sic*] all dead," so similar to the statement in question that any additional prejudice caused by the prosecutor's improper reference to the statement was minimal. Consequently, we find no reversible error on this issue.

■ We next examine defendant's contention that he was unfairly prejudiced by the court's finding, prior to sentencing, that the defendant had a preexisting intent to commit the double murder. Defendant claims that such a determination had no basis in the record and was inconsistent with the jury's verdict of voluntary manslaughter. He, therefore, urges the court to vacate the sentence. We decline to do so.

It is well settled that a court of review, in considering the appropriateness of punishment, must give great weight to the judgment of the trial court. (*People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 108, 458 N.E.2d 1370.) It is also well established that in determining the appropriate sentence to impose, the trial court is not bound by a

rigid adherence to the rules of evidence but may search anywhere in the record, within reasonable bounds, for facts which tend to aggravate or mitigate the offense. (*People v. Meeks* (1980), 81 Ill. 2d 524, 535, 411 N.E.2d 9; *People v. Adkins* (1968), 41 Ill. 2d 297, 301, 242 N.E.2d 258.) This inquiry is limited only by the prerequisite that the information considered be accurate and reliable. *People v. Meeks* (1980), 81 Ill. 2d 524, 535, 411 N.E.2d 9; *People v. Crews* (1967), 38 Ill. 2d 331, 337, 231 N.E.2d 451.

In the instant case, the defendant asserts that there was no evidence in the record that the defendant went to the house with the intent to kill both Robinson and Jones. We cannot agree with this contention. Although the defendant testified that he went to 332 South Avenue with the hope of "straightening things out," from a review of the testimony, we think, it was possible that he may have wanted to get even with the victims for conspiring to have him killed. The defendant admitted that Robinson hired Sanford Ford to kill him, that Willie Jones knew about it, and that two days later he went to the boarding house, carrying a loaded weapon, specifically to see Robinson. The evidence further shows that he tied up Armstrong, Hill, and Jones, waited until Robinson came to the door, and then shot him. At trial the defendant testified that he thought Robinson went for his gun; however, he admitted under cross-examination that he never saw a gun. Finally, despite defendant's claim that Jones came at him and appeared to draw a pistol, the police officers' uncontroverted testimony, corroborated by Mary Armstrong, was that Jones was found bound and gagged. Based on these facts, we think it could be reasonably inferred that defendant may have gone to the house intending to kill both victims.

Under sections 5—8—1 and 5—8—2 of the Unified Code of Corrections, it is within the discretion of the trial court to sentence a defendant to the maximum sentence permitted where it finds a felony has been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1, 1005—8—2.) Here, there is sufficient evidence to support such a finding. Eyewitnesses to the killings testified that the victims were unarmed, that the defendant opened fire suddenly, without apparent provocation, and that Willie Earl Jones was found bound and gagged and shot at close range. Although we cannot say that the judge was correct in making a "finding" that the defendant went to the household with the intent to kill the victims, he could properly consider any aggravated circumstances in imposing the maximum sentence. Therefore, if any error occurred, it was harmless since

there was, in any case, sufficient evidence in the record to support the sentence.

■ The defendant next contends that the trial court abused its discretion in imposing a sentence of natural life for the murder of Willie Earl Jones without giving adequate consideration to such mitigating factors as the defendant's history of mental problems, his long-term drug and alcohol abuse, and the possibility that defendant may have been amenable to rehabilitation.

As previously noted under section 5—8—1(a)(1) of the Unified Code of Corrections, a court may sentence a defendant convicted of murder to a term of natural life if it finds that "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) However, section 5—8—1(a)(1) does not permit a court to enter a sentence of natural life solely on the basis of the seriousness of the offense committed without regard to a defendant's rehabilitative potential. (*People v. Cartalino* (1982), 111 Ill. App. 3d 578, 591, 444 N.E.2d 662; *People v. Merchel* (1980), 91 Ill. App. 3d 285, 295, 414 N.E.2d 804.) Thus, in determining a proper sentence for any felony, including murder, factors in aggravation and mitigation must be considered. (*People v. Cartalino* (1982), 111 Ill. App. 3d 578, 591, 444 N.E.2d 662; *People v. Bartik* (1981), 94 Ill. App. 3d 696, 703, 418 N.E.2d 1108.) Moreover, section 5—4—1(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(c)) requires that a court specify on the record the particular evidence, information, factors in mitigation and aggravation or other reasoning that led to the sentencing determination.

The record reveals that prior to sentencing the court received a nine-page presentence investigation report. Defense counsel was asked for any corrections or additions and was also requested to present any further evidence in mitigation. Counsel acknowledged that she had no "formal" evidence to submit but stated that she wished to argue the testimony at trial. She was then allowed to make extensive arguments as to factors in mitigation. It has been held that the court's examination of the presentence investigation report, which recites several mitigating factors, is, in itself, a basis for finding that defendant's potential for rehabilitation was considered. (*People v. Shumate* (1981), 94 Ill. App. 3d 478, 485, 419 N.E.2d 36; *People v. Belvedere* (1979), 72 Ill. App. 3d 998, 1026, 390 N.E.2d 1239.) Additionally, as noted by this court in *People v. Bergman* (1984), 121 Ill. App. 3d 100, 109, 458 N.E.2d 1370, where mitigation evidence is before the court, it is presumed that the sentencing

judge considered the evidence, absent such indication, other than the sentence imposed, to the contrary. (*People v. Goodman* (1983), 116 Ill. App. 3d 125, 127-28, 451 N.E.2d 607; *People v. Baker* (1983), 114 Ill. App. 3d 803, 811-12, 448 N.E.2d 631.) Also, where a sentencing judge articulates factors in aggravation, a court of review may assume the trial judge properly considered factors in mitigation. *People v. Baker* (1983), 114 Ill. App. 3d 803, 811-12, 448 N.E.2d 631; *People v. Bartik* (1981), 94 Ill. App. 3d 696, 701, 418 N.E.2d 1108.

In the instant case, the lower court determined that the following factors were present in aggravation: (1) that the defendant's conduct caused or threatened serious harm; (2) that defendant had a history of prior delinquency or criminal activity; and (3) that the sentence was necessary to deter others from committing the same offense. The court also made a lengthy examination of defendant's testimony, in which defendant claimed that, in a drug-induced state and in great fear for his life he shot both Robinson and Jones. The court additionally noted evidence indicating that defendant suffered from a history of mental and drug-related problems, including hospitalization for an unsuccessful suicide attempt. We think this shows the trial judge properly considered factors in mitigation.

Under section 5—5—3.1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.1(a)), factors in mitigation include evidence that defendant acted under a strong provocation, that there were substantial grounds tending to excuse or justify defendant's criminal conduct (though failing to establish a defense), and that defendant's criminal conduct was the result of circumstances unlikely to recur. It appears to us that in considering these potentially mitigating factors, the court found that they were either inapplicable or, at best, of minimal significance. Thus, in considering arguments of counsel in aggravating and mitigation, together with the totality of the circumstances, the trial court found a term of natural life appropriate to defendant's crime. Consequently, we find that the trial judge properly considered potential factors in mitigation and did not abuse his discretion in imposing a sentence of natural life. *People v. LaPointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

■■■ The defendant's final argument is that the trial court erred in imposing an extended sentence on his voluntary manslaughter conviction. He contends that, by statute, an extended term may only be imposed on the most serious offense for which a defendant was convicted. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a); see also *People v. Evans* (1981), 87 Ill. 2d 77, 87, 429 N.E.2d 520.) We agree. Section 5—8—2(a) of the Criminal Code of 1961 provides:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 *for the class of the most serious offense of which the offender was convicted* unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a); *People v. Evans* (1981), 87 Ill. 2d 77, 87, 429 N.E.2d 520.)

In *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 1149-50, 428 N.E.2d 937, the appellate court, in applying section 5—8—2(a), vacated a defendant's extended sentence because it did not belong to the class of the most serious offense of which the defendant was convicted. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a).) Similarly, this court in *People v. Winston* (1982), 106 Ill. App. 3d 673, 689, 435 N.E.2d 1327, vacated an extended sentence for robbery where the defendant had also been convicted of murder. Here, the defendant was convicted of both voluntary manslaughter and murder, a separate and more serious offense than voluntary manslaughter, a Class 2 felony at the time of the offense. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—2.) Accordingly, we vacate the extended term of 14 years on the voluntary manslaughter conviction, and pursuant to Supreme Court Rule 615(b)(4), reduce the defendant's sentence to a consecutive term of seven years, the maximum for a Class 2 felony. 87 Ill. 2d R. 615(b)(4); *People v. Winston* (1982), 106 Ill. App. 3d 673, 689, 435 N.E.2d 1327.

Based on the foregoing, the judgment of the circuit court of Lake County is affirmed as to the defendant's conviction for murder and voluntary manslaughter. Judgment is also affirmed as to defendant's sentence for murder but modified as to his sentence for voluntary manslaughter. Judgment is also affirmed as to defendant's sentence for murder but modified as to his sentence for voluntary manslaughter to a consecutive seven-year term.

Affirmed in part; modified in part.

UNVERZAGT and SCHNAKE, JJ., concur.